KENNA TRADING, LLC, JETSTREAM BUSINESS LIMITED, TAX MATTERS PARTNER, ET AL., PETITIONERS [1] *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 7551–08, 7552–08, 7553–08, 7554–08, 7555–08, 7556–08, 7618–08, 7625–08, 9021–08, 9035–08, 9036–08, 9037–08, 9038–08, 9039–08, 9040–08, 9041–08, 9042–08, 9121–08, 9122–08, 9123–08, 9124–08, 9125–08, 9126–08, 9127–08, 9128–08, 14094–08, 16796–08, 19924–08, 19925–08, 13980–09, 13981–09, 13982–09, 13983–09, 27636–09, 30586–09, 671–10.

Filed October 16, 2014.

Brazilian retailers purportedly contributed distressed consumer receivables to a limited liability company, S, treated as

---

[1] Cases of petitioners listed in the appendix remain consolidated herewith. Other petitioners have settled their cases with respondent, and therefore their cases have been severed since the trial of these cases

a partnership for Federal income tax purposes. S claims carryover bases in these receivables under I.R.C. sec. 723. In 2004 S in turn contributed some of these Brazilian receivables to trading companies and contributed its interest in each trading company to a holding company. S claimed a cost of goods sold for each holding company equal to the basis of the receivables contributed. S then sold an interest in each holding company to an investor. The trading companies claimed bad debt deductions. In 2005 S allegedly contributed more of the Brazilian receivables to main trusts. Each main trust then assigned the receivables to a newly created subtrust. Investors allegedly contributed cash to the main trust in exchange for the beneficial interest in the subtrust. The subtrust claimed a bad debt deduction. Asserting that the subtrusts were, for Federal income tax purposes, grantor trusts, the investors claimed deductions on their tax returns. Mr. Rogers, the creator of the investment program, also invested in such a trust. R disallowed the bad debt deductions, adjusted S' income for 2004 alleging that S inflated its cost of goods sold, determined that S failed to include all items of income in its gross receipts for 2004 and 2005, and disallowed S' business expense deductions. R also determined I.R.C. sec. 6662(h) gross valuation misstatement penalties against S, the trading companies, and Mr. and Mrs. Rogers, I.R.C. sec. 6662(a) accuracy-related penalties on the amounts of S' underpayments due to increased gross receipts for unreported income and the disallowed deductions, and an I.R.C. sec. 6662A listed transaction understatement penalty against S for the 2005 taxable year. *Held*: The Brazilian retailers did not intend to enter into a partnership for Federal income tax purposes. *Held*, *further*, S had a cost basis, not a carryover basis, in the receivables. *Held*, *further*, the transactions in issue lacked economic substance. *Held*, *further*, the trading companies are not entitled to I.R.C. sec. 166 deductions. *Held*, *further*, Mr. and Mrs. Rogers purchased their beneficial interest in the subtrust and are not entitled to a carryover basis. *Held*, *further*, R properly disallowed the Rogerses' claimed I.R.C. sec. 166 deduction. *Held*, *further*, S overstated its cost of goods sold. *Held*, *further*, R correctly adjusted S' income to reflect certain unreported deposits. *Held*, *further*, S is not entitled to the disallowed deductions. *Held*, *further*, S and the trading companies are liable for the I.R.C. sec. 6662(h) gross valuation misstatement penalty. *Held*, *further*, S is liable for an I.R.C. sec. 6662(a) and (b) accuracy-related penalty on the underpayments attributable to the omitted items of income and the disallowed deductions. *Held*, *further*, R's I.R.C. sec. 6662A listed transaction understatement pen-

took place.

alty against S is sustained insofar as related to the income from the trust transactions.

*John E. Rogers* (an officer), for petitioner Jetstream Business Limited.

*John E. Rogers*, for petitioners John E. and Frances L. Rogers.

*Ronald S. Collins, Jr.*, *Laurie A. Nasky*, and *Bernard J. Audet, Jr.*, for respondent.

*Michael D. Hartigan* (an officer), for participating partners in docket Nos. 7552–08, 9039–08, 9121–08, and 13982–09.

WHERRY, *Judge*: In 2003 John Rogers developed, marketed, and sold investments, which also allegedly provided potential tax shelter, whereby investors in a partnership structure could claim partially worthless bad debt deductions under section 166[2] on certain distressed assets formerly owned by a Brazilian retailer. Those transactions did not produce the hoped-for tax benefits for the myriad of reasons outlined in our prior opinions and by the Court of Appeals for the Seventh Circuit. *See Superior Trading, LLC v. Commissioner*, 137 T.C. 70 (2011), *supplemented by* T.C. Memo. 2012–110, *aff'd*, 728 F.3d 676 (7th Cir. 2013). In 2004 Mr. Rogers sold the same shelter, this time using additional distressed assets of other Brazilian retailers. That same year, Congress modified the rules governing the allocation of built-in loss property contributed to a partnership, rendering the partnership flow-through loss-shifting shelter impotent.[3] Undeterred, for various transactions entered into after October 22, 2004, Mr. Rogers selected and used a trust structure to attempt to gain the same tax benefits for himself and various investor-clients.

Respondent has challenged all of the partially worthless bad debt deductions under section 166, for the partnerships[4]

---

[2] All section references are to the Internal Revenue Code of 1986 (Code), as amended and in effect for the tax years at issue, and all Rule references are to the U.S. Tax Court Rules of Practice and Procedure.

[3] The American Jobs Creation Act of 2004 (AJCA), Pub. L. No. 108–357, sec. 833, 118 Stat. at 1589, amended secs. 704, 734, and 743 effective for transactions entered into after October 22, 2004. Sec. 704 as amended provides that in the case of contributions of built-in loss property to a partnership, the built-in loss may be taken into account only by the contributing partner and may not be allocated to a different partner.

[4] Mr. Rogers used limited liability companies in these transactions. In

involved in the 2004 tax year [5] as well as for Mr. Rogers and his wife, Frances Rogers, who claimed a section 166 deduction on their individual tax return for 2005 using the trust variant. We consolidated the Rogerses' case with the partnership cases for the purpose of resolving only the section 166 deduction issue in that case. [6]

Respondent also challenged certain aspects of the 2004 and 2005 partnership returns of Sugarloaf Fund, LLC (Sugarloaf), the common ancestor in the many-branched family tree of partnerships and trusts through which inves-

---

part because they are treated as partnerships for Federal income tax purposes, *see* sec. 301.7701–3(a), Proced. & Admin. Regs., we refer to them as such.

[5] One partnership, Zurichsee Trading, LLC, docket No. 13980–09, claimed a sec. 166 deduction on its 2005 Federal income tax return, and respondent issued a notice of final partnership administrative adjustment (FPAA) for this year.

[6] Mr. Rogers on brief asserts that his wife is entitled to innocent spouse relief. We did not try this issue and do not decide it here. We likewise do not decide whether respondent properly determined penalties against the Rogerses.

Along with Mr. Rogers, Gary R. Fears, petitioner in docket No. 27636–09, invested in the trust structure in 2005. As with the Rogerses' case, we consolidated Mr. Fears' case solely for the purpose of resolving the sec. 166 deduction at issue there. Although Mr. Fears and respondent have entered into a stipulation of settled issues concerning the deficiencies in his case, the secs. 6662(a) and (h) and 6662A penalties allegedly flowing from those deficiencies, which themselves stem from the sec. 166 deduction's disallowance, remain in dispute. Mr. Fears' case remains consolidated for purposes of this Opinion because our redetermination in this partnership-level proceeding of penalties determined against Sugarloaf could potentially affect Mr. Fears, notwithstanding that he held an interest in a lower tier entity. *See* sec. 6226(f); *United States v. Woods*, 571 U.S. ___, ___, 134 S. Ct. 557, 564 (2013) (holding "that TEFRA gives courts in partnership-level proceedings jurisdiction to determine the applicability of any penalty that could result from an adjustment to a partnership item, even if imposing the penalty would also require determining affected or nonpartnership items such as outside basis"). Mr. Fears resides in St. Louis, Missouri, which lies within the jurisdiction of the U.S. Court of Appeals for the Eighth Circuit. Before *Woods*, that Court of Appeals held, in the context of a gross valuation misstatement penalty determined against a sham partnership, that "outside basis is an affected item that must be determined at the partner level" before a penalty determined at the partnership level may be imposed. *See Thompson v. Commissioner*, 729 F.3d 869, 873 (2013), *rev'g and remanding* 137 T.C. 220 (2011). Thus, as stated in our order of May 3, 2013, we intend to return Mr. Fears' case to the general docket after issuance of this Opinion.

tors in Mr. Rogers' shelters claimed tax losses. First, respondent alleges that Sugarloaf overstated its cost of goods sold for 2004 and 2005 on account of inflated tax bases of sold partnership interests. In addition, after concessions, respondent alleges adjustments to Sugarloaf's partnership income due to alleged underreported income of $299,996 and $925,467 for the 2004 and 2005 taxable years, respectively. [7] Respondent also disallowed a number of Sugarloaf's claimed deductions, amounting to $747,069 for the 2004 tax year and $982,436 for the 2005 tax year, as unsubstantiated.

Respondent determined against Sugarloaf for each tax year a section 6662(a) and (h) penalty for a gross valuation misstatement, a section 6662(a) penalty on the amount of the underpayment attributable to each year's disallowed deductions, and a section 6662A penalty for understatements attributable to undisclosed reportable or listed transactions. Against the lower tier partnerships whose cases were tried with Sugarloaf's, respondent determined penalties under section 6662(a) and (h) due to gross valuation misstatements and section 6662(a) and (b)(1), (2), and (3) penalties due to negligence, substantial understatements of income tax, and substantial valuation misstatements.

Jetstream, as tax matters partner for Sugarloaf and each of the other partnerships whose cases we consolidated with Sugarloaf's for trial, petitioned this Court for readjustment of partnership items and redetermination of penalties. [8]

In this Opinion, we resolve: (1) whether Jetstream and the Brazilian retailers formed a bona fide partnership for Federal income tax purposes for purposes of servicing and collecting distressed consumer receivables owed to the retailers; (2) whether the Brazilian retailers made valid contributions of the receivables to the purported partnership under section 721; (3) whether the retailers' claimed contributions to and subsequent redemptions from Sugarloaf should be collapsed

---

[7] Respondent and Jetstream Business Limited (Jetstream), Sugarloaf's tax matters partner, entered into a stipulation of settled issues reducing the unreported income from $1,549,692 for 2004 and $1,227,467 for 2005 to the amounts stated above.

[8] Jetstream was represented in this litigation by its officer, Mr. Rogers, who also represented himself and his wife in their consolidated individual tax case. Throughout this Opinion, we frequently refer to petitioners, whether jointly or individually, simply as Mr. Rogers.

into a single transaction and treated as a sale of the receivables, such that the receivables had a cost basis under section 1012 rather than a carryover basis under section 723; (4) whether the 2004 partnership transactions had economic substance; (5) whether the 2004 partnership transactions satisfied the statutory prerequisites for a section 166 deduction; (6) whether the 2005 trust transactions should be collapsed into sales or lacked economic substance, such that Mr. and Mrs. Rogers' trust investment would not entitle them to a section 166 deduction for 2005; (7) whether Sugarloaf understated gross income for the 2004 and 2005 tax years; (8) whether Sugarloaf is entitled to various deductions for the 2004 and 2005 tax years; (9) whether Sugarloaf and the other partnerships are liable for section 6662(a) penalties; and (10) whether Sugarloaf is liable for the section 6662A penalty.

We hold for respondent on all issues.[9]

## FINDINGS OF FACT

The parties' stipulation of facts, supplemental stipulation of facts, and second supplemental stipulation of facts, all with the facts found from the accompanying exhibits, are incorporated herein by this reference, as are all stipulations of settled issues filed in various of these consolidated cases.[10] The parties have stipulated that venue for appeal would be the Court of Appeals for the Seventh Circuit.

## I. *The Mastermind: John E. Rogers*

The central individual in these cases is John Rogers. During the years at issue Mr. Rogers was a partner at the Chicago-based law firm Seyfarth Shaw. As we have previously found, Mr. Rogers

---

[9] With regard to Sugarloaf, our analyses and holdings as to questions (1)–(5) represent alternative reasons, all of which, when applied, result in the same ultimate tax result. Similarly, with regard to the trust shelter, we offer alternative analyses and holdings on question (6).

[10] Petitioners objected to a number of the stipulations and stipulated exhibits on the grounds of relevance. According to Fed. R. Evid. R. 401: "Evidence is relevant if: (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action." We find the stipulations and stipulated exhibits relevant and consequently overrule petitioners' objections.

started his professional career in 1969 at the now-dissolved accounting firm Arthur Andersen, where he rose through the ranks to eventually become an equity partner. [Mr.] Rogers left Arthur Andersen in 1991 and went to work for a startup medical device company called Reddy Laboratories. The venture failed after the Food and Drug Administration denied the company's application for a license. In 1992 [Mr.] Rogers joined FMC Corp., a $5 billion company with operations in over 100 countries. [Mr.] Rogers served as FMC Corp.'s director of taxes and assistant treasurer through 1997.

In 1998 [Mr.] Rogers became an equity partner in Altheimer & Gray, a full-service law firm headquartered in Chicago, Illinois, with offices in Eastern Europe. Altheimer & Gray dissolved in 2003, and [Mr.] Rogers joined the Seyfarth Shaw, LLP (Seyfarth Shaw), law firm in July of that year. * * * [Mr.] Rogers left Seyfarth at the end of May 2008, when he opened his own firm, Rogers & Associates.

[*Superior Trading, LLC v. Commissioner*, 137 T.C. at 75.]

Mr. Rogers during or before 2003 conceived a plan that he contended would successfully invest in and manage distressed retail consumer receivables overseas and remit the proceeds to the United States. He used a tiered partnership structure in 2003 and most of 2004 and a tiered trust structure in 2005, 2006, and 2007 to sell interests to individual investors. Mr. Rogers contended the business would profit through aggressive collection efforts, translation gain from currency speculation, and a planned initial public offering. The first step under this plan was for Brazilian retailers to "contribute" receivables to a limited liability entity controlled by Mr. Rogers, which, for U.S. tax purposes, would accede to the tax basis of the retailers in the consumer debt.

In 2003 he used a limited liability company called Warwick Trading, LLC, to purchase receivables from Lojas Arapua, S.A. (Arapua), a Brazilian retailer of household appliances and consumer electronics. In 2004 he used a different limited liability company, Sugarloaf, to which two other Brazilian retailers, Globex Utilidades, S.A. (Globex), and Companhia Brasileira de Distribuição (CBD), also "contributed" distressed accounts receivable for interests in that company. In 2004 Sugarloaf contributed a tranche of those assets to other limited liability companies (trading companies). Sugarloaf then contributed most or all of its interest in the trading companies to yet other limited liability companies (holding companies). In 2005 Sugarloaf "contributed" assets to trusts (main trusts), which each created another trust (subtrust). The main trust assigned the beneficial interests of the receiv-

ables in the subtrust to an investor who contributed money to the main trust. In both years Sugarloaf and the trading companies entered loan management and servicing agreements with a British Virgin Islands company called Multicred Investments Limited and/or a Brazilian company called Multicred Investimentos Limitada. Renato Mazzucchelli and Jennifer Dowek were both intimately involved in the management and operation if not also the ownership of these companies. While the parties dispute the significance of these two companies and Mr. Rogers alleges that the British Virgin Islands company engaged in some sort of scheme to defraud, such a dispute is irrelevant to these cases, and we find that for practical purposes the companies are the same and refer to them interchangeably as Multicred.

Mr. Rogers formed Sugarloaf through entities he owned and controlled. He was the sole owner of an S corporation, Portfolio Properties, Inc. (PPI), which owned Jetstream, at that time a British Virgin Islands company. On April 17, 2003, Mr. Rogers, through Jetstream, formed Sugarloaf, a Delaware limited liability company. According to the operating agreement, Jetstream was the initial manager. On July 23, 2003, Mr. Rogers sent an engagement letter to Mr. Mazzucchelli as "Managing Member" of Sugarloaf by which Sugarloaf agreed to retain Seyfarth Shaw as its legal counsel. In August Mr. Rogers represented to Seyfarth Shaw that the owners of Sugarloaf were Mr. Mazzucchelli and Ms. Dowek. He never disclosed Jetstream's ownership, which was 100% at that time.

## II. *The Receivables: The Brazilian Connection*

### A. *Arapua*

On July 1, 2004, Sugarloaf and Arapua entered into a contribution agreement by which Arapua agreed to "contribute" distressed consumer receivables with an outstanding balance of R$37,765,501 to Sugarloaf in exchange for a 99% membership interest.[11] Sugarloaf later disposed of these receivables

---

[11] When we refer to receivables of the three Brazilian retailers, we refer to checks written by consumers for products. Brazilian companies at the time generally lacked sufficient purchase-with-financing installment sales

Continued

in a transaction not necessarily at issue in these cases. Mr. Rogers signed this contribution agreement as manager of Sugarloaf.

B. *Globex*

In July 2004 Sugarloaf entered into a contribution agreement with Globex, a consumer-goods retailer doing business under the name Ponto Frio. According to the contribution agreement, Globex contributed receivables with an outstanding balance of R$219,087,756.03 in exchange for a 99% membership interest in Sugarloaf. Mr. Rogers signed this agreement as manager of Sugarloaf. [12]

The parties provided three versions of the contribution agreement: a Portuguese version, a certified English translation of that version, and the English version provided by Mr. Rogers. A cursory comparison of the certified English translation and Mr. Rogers' version reveals that Mr. Rogers' and the Portuguese versions are not reliable translations of one another. One difference is that, according to the certified English translation, Sugarloaf represented that it "is aware that, for purposes of Brazilian law, taxes were lowered for accounting and tax purposes for the majority of the tax credits of most objects of this instrument, although it had not been lowered for the purpose of American law." The version

facilities and in lieu thereof had the practice of extending credit to consumers whereby the consumer would write a series of postdated checks and the retailer would deposit those checks on the appropriate day. The receivables in these cases are distressed, meaning that they are past due. The average age of the sampled receivables as of the date of contribution to Sugarloaf was 5.2 years in the case of CBD and 6.6 years in the case of Globex. The contributed receivables' value in Brazilian reais was not stated in the CBD contribution agreement but was to be provided in a schedule I to the agreement. However, no schedule I was attached to the translated version of the agreement Mr. Rogers placed in evidence and submitted to the Court. The same was true of the translated Globex contribution agreement offered by Mr. Rogers, discussed *infra* p. 331.

[12] According to the Arapua contribution agreement, Arapua already owned 99% of Sugarloaf. The transfer of a 99% interest to Globex is a mathematical impossibility. And, as discussed *infra* pp. 332–334, CBD entered a contribution agreement whereby it ostensibly received a 17% membership interest. Mr. Rogers contends that the subsequent contribution agreements merely diluted the previous ownership. But these numbers cannot be reconciled, and they support our finding, *see infra* pp. 351–353, that the parties did not intend to form a partnership.

provided by Mr. Rogers lacks identical or even analogous language.

Mr. Rogers' version of the contribution agreement purported to have attached an exhibit A which set forth all of the receivables contributed. The certified English translation included an annex I, which stated in part: "The data related to the Credits are recorded on a CD–Rom delivered in this act by GLOBEX to the Fund [Sugarloaf]". The parties stipulated that neither exhibit A nor the media referenced in annex I were attached to the agreements.

One of the individuals promoting the shelter for Mr. Rogers, Michael Hartigan, sent money in 2004 to Multicred, which passed on a portion of that money to Globex as indicated in a January 5, 2005, email from Ms. Dowek to Mr. Rogers. These payments were, in Mr. Rogers' own words, "constructive distributions from Warwick or Sugarloaf." In 2005 Mr. Hartigan sent money received from the investors, less his fees, directly to the credit of the trusts.[13]

At some point, Globex requested a partial redemption of its membership interest. Initially Globex requested a 13.24% partial redemption and apparently later requested a larger or complete redemption. In the spring of 2006 Ms. Dowek sent two emails to Mr. Rogers telling him that Globex needed documentation showing the sale of its interest in Sugarloaf. On December 15, 2006, Mr. Rogers wired $300,000 to a bank account in the name of Globalstores, S.A. A week or so later, Ms. Dowek wrote the following to Mr. Rogers: "Bought more from Globex . . . Global Store . . . so please send $650K instead of $350K." Mr. Rogers agreed and on December 28, 2006, wired an additional $650,000 to the account of Globalstores, S.A. Further correspondence between Mr. Rogers and the various parties involved in these transactions demonstrates an intent to redeem Globex out of Sugarloaf.

In April 2007 Mr. Rogers expressed concerns to Multicred that Globex never transferred the distressed assets to Sugarloaf. He asked Multicred for proof of a transfer before 2006, which was when collections on the Globex receivables began. The parties stipulated that Globex retained custody of the receivables until at least March 28, 2007.

---

[13] *See infra* pp. 342–344.

C. *CBD*

In the fall of 2004 Sugarloaf and Multicred were negotiating the acquisition of receivables from another Brazilian retailer, CBD, a large supermarket chain in Brazil which operated some stores under the brand name Pão de Açúcar. [14] Early drafts of agreements from Multicred indicate that as of August 3, 2004, Sugarloaf and CBD intended to enter into a purchase-sale agreement. On October 1, 2004, Sugarloaf and Multicred entered into a contribution agreement with CBD. Once again, there are several versions of this contribution agreement: one copy in Portuguese, a certified English translation of the Portuguese version, and an English-language version provided by Mr. Rogers. While, from their cover pages, the Portuguese version and Mr. Rogers' version appear to be translations of one another, a cursory examination of the format of the body of the agreement in each version quickly reveals that they are not accurate translations.

The certified English translation only confirms that Mr. Rogers' version and the Portuguese version are different documents. The certified translation and Mr. Rogers' version both state that CBD received a 17% membership interest in Sugarloaf in exchange for a contribution of receivables contracts. Mr. Rogers' version indicates that the subject receivables contracts are listed in schedule I, which itself refers to an attached "diskette" (although apparently Mr. Rogers never received a copy), while the certified translation includes an annex I which references a contemporaneously delivered CD–ROM and provides a detailed key to the data supposedly contained thereon. Mr. Rogers' version and the certified translation both state that the receivables had an outstanding balance of R$154,630,651.15. Only the certified translation, however, discloses that the *value* of these receivables was R$1,855,568. Further, according to the certified translation, the Portuguese document is an agreement between CBD, Sugarloaf (with Mr. Rogers signing as manager), and Multicred (with Mr. Mazzucchelli signing on its behalf). Mr. Rogers' version, however, is an agreement between only CBD and Sugarloaf, with Mr. Rogers again

---

[14] The parties often refer to CBD as CBD/PDA or PDA. For convenience, we use CBD.

signing as manager. Finally, Mr. Rogers' version contains a representation by CBD that it had not taken action with respect to the receivables that would constitute a charge-off under section 166. The certified translation contains no such representation.

Sugarloaf, CBD, and Multicred entered the contribution agreement with the understanding that CBD would be redeemed out for cash shortly. On December 22, 2004, Sugarloaf loaned Multicred $800,000 pursuant to a promissory note. According to an October 21, 2007, email from Mr. Rogers: "The $800,000 was used to redeem out PDA."[15] Multicred then purchased CBD's 17% interest in Sugarloaf for R$1,855,568 on December 29, 2004. On October 14, 2005, Multicred assigned its interest in Sugarloaf to an entity called Sugarloaf Investimentos Limitada (Sugarloaf Limitada), which was owned by Sugarloaf and controlled by Mr. Rogers, in exchange for Sugarloaf Limitada's assumption of the obligations to Sugarloaf under the $800,000 promissory note. Sugarloaf, through Mr. Rogers, was a party to this agreement. On September 22, 2006, Sugarloaf Limitada sold the 17% interest in Sugarloaf back to Sugarloaf, and it paid off three-quarters of the promissory note. Mr. Rogers signed this agreement on behalf of both Sugarloaf and Sugarloaf Limitada. Sugarloaf Limitada paid the remaining balance due on the note in 2007. The Sugarloaf purchase agreement refers to these transactions as "stage" or "stages".

In addition, the record contains hints that a shadow investment group may have been involved in the purchase of the CBD receivables. An email from Ms. Dowek says: "[W]e will have four or five investors purchasing their [CBD's] interest and * * * Multicred will act as agent for them." Additional documents implicate an entity named Sugarloaf Overseas, Ltd. (Sugarloaf Overseas), in this shadow investment group; it received $1 million from Sugarloaf as payment for assets on or about February 26, 2006. Mr. Rogers repeatedly denied knowing Sugarloaf Overseas and claimed that he could remember no reason why Sugarloaf would have made the $1 million transfer. We do not credit his testimony and believe that Mr. Rogers knew, at the time, what Sugarloaf Overseas

---

[15] PDA and CBD are one and the same. *See supra* note 14.

was and also what its role was, however murky to us, in the CBD buyout.

### D. *Collections*

As mentioned, collections on the Globex receivables did not begin until 2006 at the earliest. As for the other receivables, Multicred did not have collection data available for 2004. Mr. Rogers therefore used R$2,656, or about USD$1,000, as the collections reported for each investor in 2004.

### E. *Valuation and Performance*

Sugarloaf received valuations for the CBD and the Globex receivables from Financial Management Control, Ltda. (FMC). Both these letters were dated October 1, 2004, but the parties stipulated that Sugarloaf did not receive the letters until 2007. The letters are almost identical. The FMC letter for Globex opined that the fair market value of the receivables, which had an average age of six to seven years and average balance of R$500, was 6% of the notional face value amount. FMC concluded that the CBD receivables had an average age of three years and average balance of R$300 and were also worth 6% of the notional face value amount. These appraisal letters bear a remarkable similarity to an appraisal letter written by a company called Lourenço Assessoria e Recuperadora de Crédito Ltda. (LARC) for Warwick. The LARC appraisal letter purported to appraise Arapua receivables at, again, 6% of the notional face value amount.

At the trial and without objection, respondent offered John D. Finnerty as an expert in valuation of fixed income investments. The Court accepted Dr. Finnerty as such an expert and received his report into evidence. Dr. Finnerty used a discounted cashflow method which took into account similar assets, expected net cashflow, and the collection expenses at the time of acquisition. He concluded that the Globex receivables had a fair market value of at most 0.5% of the notional face value amount and that the CBD receivables had a fair market value of at most 0.8% of the notional face value amount.

Dr. Finnerty also dismissed the FMC valuations as being internally inconsistent and containing flawed reasoning. For example, the FMC valuations purport to use the comparables

method, the replacement method, and the discounted cashflow method to arrive at the 6% figure. But the letters state that the comparables method yields a 2% to 4% valuation and the replacement method yields a 2% valuation for the CBD receivables and a 3% valuation for the Globex receivables. The letters do not discuss a specific value determined using the discounted cashflow method and why such a method would result in higher valuations. So, it is not clear how FMC arrived at the 6% valuations. Furthermore, the FMC letters purport to affirm the discounted cashflow analysis provided by Multicred without mentioning what valuation that method yields. Finally, FMC fails to explain why it gave identical valuations to two sets of receivables despite significantly different characteristics, such as the age and average balance per account of the receivables. The Court is left to assume that the $200 higher average balance of the Globex receivables exactly balanced out the fact that their average age was three to four years older than the CBD receivables so that each group was worth 6% of face.

At trial and without objection, the Court accepted respondent's witness Martin D. Hanan as an expert in business valuation and received his report into evidence. Mr. Hanan's extensive report opined as to the expected and actual pretax and after-tax rates of return from the investments at issue in these cases. He reviewed the amounts paid by investors, the collections allegedly made, and other data. He concluded that an after-tax rate of return was positive only because of the tax benefit afforded by the section 166 deduction. Mr. Hanan concluded that the exorbitant fees and the exchange rate at the time of the origination of the receivables contributed heavily to the negative pretax rates of return. Only Mr. Hartigan's investment, on his own behalf, stood a chance of realizing a profit because Mr. Hartigan waived his own fee. Mr. Hannan concluded that a reasonable investor would not have invested in this transaction but for the tax benefit. The Court does note that Mr. Hannan's analysis assumes a constant exchange rate of 2.00 Brazilian reais to the U.S. dollar. Mr. Rogers with some reasonable basis for his conclusions believed the Brazilian real was undervalued and would appreciate vis-a-vis the dollar within a reasonable investment period. Investors may have thought likewise.

F. *Other Problems With the Receivables*

At trial and without objection, the Court accepted respondent's witness Sergio Tostes as an expert in Brazilian commercial taxation law. Mr. Tostes reported that the contribution agreement between Globex and Sugarloaf was illicit under Brazilian law because it purported to assign a 99% interest in Sugarloaf to Globex. According to Mr. Tostes, because Arapua already owned a 99% interest, the Globex contribution agreement was legally impossible. Mr. Tostes opined that the CBD agreement is similarly invalid under Brazilian law.

III. *The 2004 Partnership Structure: Your DAD's Tax Shelter*

The 2004 partnership shelters essentially mirror the Distressed Asset/Debt or "DAD" shelter structure we described in *Superior Trading, LLC v. Commissioner*, 137 T.C. at 71–73.

A. *The Typical Structure*

Mr. Rogers typically structured the 2004 shelters as follows. Jetstream and Sugarloaf would create a trading company, an Illinois limited liability company, with Jetstream contributing a nominal amount of cash (e.g., $1,500) for a 1% membership interest and Sugarloaf contributing distressed assets. The contribution agreement between Sugarloaf and the trading company would state that Sugarloaf was contributing a portfolio of notes. The contribution agreement would also state that exhibit A would set forth the notes contributed, but this exhibit was never prepared for any of the 2004 transactions.[16]

Jetstream and Sugarloaf would then form a holding company, also an Illinois limited liability company, with Jetstream contributing a nominal amount of cash for a 1% interest and Sugarloaf contributing a 99% interest in a trading company in exchange for a 99% interest. Next,

---

[16] In its reply brief at 114, Jetstream states: "The schedules were prepared and were provided to IRS [Internal Revenue Service] auditors. Mazzucchelli retained the original version." This contention directly contradicts paragraph 147 of the parties' trial stipulation, which states in part: "Exhibit A to the Contribution Agreements between Sugarloaf and each trading company was never prepared." To the extent that Jetstream's objection requests to be relieved of the stipulation, we reject that request.

Sugarloaf would sell its 99% interest or, in some cases, a 98% interest, in the holding company to an investor.[17] Two individuals marketed the Sugarloaf transactions for Mr. Rogers, Mr. Thomas Agresti and Mr. Hartigan. The investor would pay a percentage of the U.S. dollar notional amount of the receivables, and the size of that percentage depended on whether the investor purchased the interest through Mr. Hartigan or Mr. Agresti. Jetstream would retain a 1% interest in each trading company and each holding company and would act as tax matters partner for both companies. Sugarloaf would retain a 1% interest in each trading company and for the most part in each holding company. Numerous iterations of this sequence took place.

The investors' contribution agreements incorrectly stated the value of the outstanding balance of the receivables contributed. For instance, the Bielersee contribution agreement states that Sugarloaf contributed assets with an outstanding balance of R$2,500,000. But, on its Form 1065, U.S. Return of Partnership Income, Bielersee reported a section 166 loss of $2,425,000, or 97% of $2,500,000. That amount, in Brazilian currency, would be greater than R$2,500,000. In any event, the amount contributed to the partnership depended on the size of the tax deduction the investor sought.

Generally, Mr. Agresti's clients paid 8% of the U.S. dollar notional amount, while Mr. Hartigan's clients paid 15%. Of those amounts, between 4% and 5% went to Sugarloaf or PPI as the purchase price of the receivables. Another 2% to 3% represented an amount retained by Sugarloaf for professional and operating expenses. Mr. Rogers gave discounts to his two promoters. Mr. Hartigan paid only 1.75% to Sugarloaf to buy into the shelter, and Mr. Agresti paid 4%. Like the percentage paid, the source of the receivables also depended on

---

[17] It is not always clear how much of an interest Sugarloaf retained in a particular holding company. The parties stipulated that Sugarloaf retained "for the most part, a 1% interest in each holding company." Jetstream, on brief, contends that "Sugarloaf retained no interest in a holding company." The documentary evidence is similarly contradictory. For example, in the case of Bielersee Trading, LLC (Bielersee), Sugarloaf purported to contribute a 98% interest in Bielersee to Alber Fund, LLC (Alber), in exchange for a 99% membership interest in Alber. Sugarloaf then purported to sell its entire 99% interest in Alber to the investor, RD3J, Ltd.

whose client the investor was. For Mr. Agresti's clients, Sugarloaf contributed CBD receivables. For Mr. Hartigan's clients, Sugarloaf used Globex receivables.

The formation of R B Taylor Trading, LLC (R B Taylor), is an exception from the general pattern. The documents indicate that Warwick, on July 17, 2004, contributed the receivables to R B Taylor in exchange for membership interests; that Warwick, on July 18, 2004, contributed 98% of R B Taylor to a holding company, Chipping Wood Fund, LLC; and that Warwick then sold 99% of the holding company on July 26, 2004, to the investors, Russell and Betsy Taylor. R B Taylor claimed a section 166 bad debt loss of $11,640,000 in 2004. A document purporting to be an inventory of receivables transferred to and owned by R B Taylor lists Globex receivables, which Warwick did not have. The investor was a client of Mr. Hartigan's. We find that, to the extent there was a partnership formed, Sugarloaf, not Warwick, was the initial contributing entity.[18]

In addition to a contribution agreement, each investor also had to enter into a subscription agreement. This agreement allowed the investor to establish sufficient tax basis in the partnership interest to claim the deduction flowing from the anticipated section 166 bad debt charge-off. The amounts of the subscription agreements were generally the same as the U.S. dollar notional amounts of the receivables less any purchase price paid. Some investors used promissory notes in favor of Sugarloaf to obtain the necessary tax basis in their partnership interests.

B. *The Music Stops*

In October 2004 Congress passed the American Jobs Creation Act of 2004 (AJCA), Pub. L. No. 108–357 sec. 833, 118 Stat. at 1589, which sharply curtailed the tax benefits of the partnership structure used by Mr. Rogers and Sugarloaf in 2004 by amending sections 704, 734, and 743. The relevant provisions had an effective date of October 20, 2004. Mr. Rogers determined that if an investor signed a letter of intent to purchase a partnership interest before that date,

---

[18] We are disappointed that the parties did not provide the Court with a complete rather than a partial copy of R B Taylor's 2004 partnership return, which could have assisted the Court with this finding of fact.

the partner would still be entitled to deduct the built-in losses from subsequently contributed receivables. In addition, if a potential investor signed a letter of intent but then backed out of the deal, Mr. Rogers determined that a new investor could be substituted for the original investor despite not having signed a letter of intent before the effective date of the AJCA.

## C. *The Underlying Investors*

Most of the individual investors in these partnerships have settled the underlying tax liability issues. In some cases the investors filed notices of election to participate under section 6226(c) and Rule 245(b) in the Tax Court cases for the trading companies in which they indirectly invested. Most of these investors have settled and have entered into stipulations of settlement with respondent. [19] But these stipulations settle these trading company cases only as to the distributive shares of the settling partners. Furthermore, Mr. Hartigan remains an officer for participating partners in four cases. At trial, Mr. Rogers, Mr. Hartigan, and respondent disagreed as to the proper tax matters partner of Knight Trading, LLC, docket No. 9121–08. We asked the parties to submit status reports on this subject, and only respondent submitted the requested report. Mr. Hartigan did not produce any documentation showing that Paragon Fund, LLC, replaced Jetstream as the tax matters partner of Knight Trading, and in the absence of other evidence, Jetstream is the proper tax matters partner.

In addition, Windmere Fund, LLC, as tax matters partner for Ironwood Trading, LLC, docket No. 19925–08, and respondent have entered into a stipulation of settled issues as to Windmere Fund's partnership items. Jetstream initially filed the petition on behalf of Ironwood Trading. Windmere

---

[19] Respondent and the following participating partners entered into stipulations of settled issues: Robert Greer, participating partner in docket No. 7555–08; Joel R. Baker, participating partner in docket No. 7625–08; Russell C. Taylor, participating partner in docket No. 9038–08; Mark Herbert, participating partner in docket No. 9124–08; Michael Koretsky, participating partner in docket No. 19924–08; and Thomas Turner, participating partner in docket No. 13980–09.

was subsequently substituted as the tax matters partner.[20] Because Jetstream initially filed the petition and retains a 1% interest in Ironwood, we treat Jetstream as a participating partner in these cases. Likewise, respondent and Arrowhead Fund, LLC, as tax matters partner for Murtensee Trading, LLC, docket No. 9040–08,[21] entered a stipulation of settled issues as to Arrowhead Fund's partnership items. Again, Jetstream was the tax matters partner at the time the petition was filed, and we treat Jetstream as a participating partner in these cases.

Finally, two participating investors have not yet settled: Jonathan Greer, participating as the ultimate investor in Grey Stone Trading, LLC, docket No. 7556–08, and Scott Ray, participating as the ultimate investor in Thornhill Trading, LLC, docket No. 9021–08. They did not appear at trial and have waived any right to participate therein.

### D. *Returns and Adjustments*

In 2004, Sugarloaf entered into at least 30 investment deals using the tiered partnership structure described above and distressed assets from Globex and CBD. The trading companies in these deals all filed Forms 1065, which were prepared by an employee of Mr. Rogers, Jonathan Gabel, and signed by Mr. Rogers, and all claimed section 166 deductions. Respondent issued FPAAs in these cases denying the following deductions:

| *Partnership name* | *Bad debt deduction sec. 166* |
| --- | --- |
| Bielersee Trading, LLC | $2,425,000 |
| Bodensee Fund, LLC | 4,850,000 |
| Connemara Trading Group, LLC | 485,000 |
| Cumnor Group, LLC | 1,940,000 |
| Davis Fund, LLC | 1,660,000 |
| Dent-Blanche Fund, LLC | 1,067,000 |
| Essex Fund, LLC | 1,940,000 |
| Grey Stone Trading, LLC | 485,000 |

[20] Participating partner Lancer A. Barton represents that he is Ironwood Trading's majority member through one or more pass-through entities, including Windmere, in which he holds at least a majority interest.

[21] Participating partner Christopher H. Brown represents that he is Murtensee Trading's majority member through one or more pass-through entities, including Arrowhead, in which he holds at least a majority interest.

| Partnership name | Bad debt deduction sec. 166 |
|---|---|
| Grand-Combin Fund, LLC ........................... | 1,455,000 |
| Harlan Fund, LLC ...................................... | 1,455,000 |
| Ironwood Trading, LLC .............................. | 970,000 |
| Kenna Trading, LLC .................................. | 970,000 |
| Knight Trading, LLC .................................. | 4,365,000 |
| Lakeview Trading, LLC .............................. | 1,670,000 |
| Larkspur Trading, LLC .............................. | 970,000 |
| Lyman Trading, LLC .................................. | 4,850,000 |
| Monte Rosa Trading, LLC .......................... | 1,940,000 |
| Murtensee Trading, LLC ............................ | 3,977,000 |
| Northgate Trading, LLC ............................. | 970,000 |
| Ofenpass Fund, LLC .................................. | 2,910,000 |
| Remington Trading, LLC ............................ | 7,275,000 |
| Ridgeway Trading, LLC .............................. | 485,000 |
| Riversedge Fund, LLC ................................ | 2,910,000 |
| Saddlebrook Trading, LLC ......................... | 4,850,000 |
| Suten Fund, LLC ....................................... | 2,910,000 |
| R B Taylor Trading, LLC ............................ | 11,640,000 |
| Thornhill Trading LLC ............................... | 485,000 |
| Turnberry Trading LLC .............................. | 824,500 |
| Warner Fund, LLC ..................................... | 2,260,000 |
| Zugersee Trading, LLC ............................... | 3,880,000 |
| Zurichsee Trading, LLC ............................. | 2,538,000 |
| Total ...................................................... | 81,411,500 |

Most trading companies claimed the deduction for 2004. Riversedge Fund, LLC (Riversedge), claimed a $450,000 deduction for 2004 and a $2,460,000 deduction for 2005.[22] Zurichsee Trading, LLC, claimed the deduction for 2005. Zugersee Trading, LLC, claimed a $3,200,000 deduction for 2004 and a $680,000 deduction for 2005. Warner Fund, LLC, claimed a $2,260,000 deduction for 2005.[23]

In most cases, the trading company claimed a deduction equal to 97% of the U.S. dollar notional value of the receivables. In other cases, the investor requested that a smaller deduction be used for that tax year. Respondent timely issued notices of final partnership administrative adjustment (FPAA) to all trading companies disallowing their claimed section 166 losses. Respondent also adjusted to zero deduc-

---

[22] We note that Riversedge's 2005 tax return is not in the record. We instead rely on the FPAA issued for that year.

[23] Warner Fund, LLC, also claimed a $650,000 deduction on its 2004 tax return. Jetstream's petition for that year, docket No. 19542–08, was dismissed as untimely.

tions claimed for amortization expenses and collection expenses. Petitioners in these partnership cases timely filed petitions for review of the partnership adjustments. [24]

## IV. *The 2005 Trust Structure: DAD 2.0*

Because Congress in late 2004 essentially eviscerated Mr. Rogers' 2004 shelter structure, Mr. Rogers moved toward a similar structure that purported to use trusts to reach the same end result. In this structure, two Illinois common law business trusts, a main trust and a subtrust, replaced the holding company and the trading company.

### A. *The Typical Structure*

When an investor agreed to purchase the shelter, Sugarloaf would form a main trust with Mr. Rogers as trustee and Sugarloaf as the initial grantor and beneficiary. Each trust would have its own bank account controlled by Mr. Rogers. Sugarloaf would then contribute receivables through a contribution agreement between Mr. Rogers, as trustee of the main trust, and Sugarloaf. The contribution agreement would include a schedule A stating: "See CD Rom disk attached hereto describing the issuer name, date of issuance, outstanding amount and other relevant data." No such media would be attached.

The investor would purchase a beneficial interest in the main trust. Sugarloaf and Mr. Rogers would then create a subtrust, allocate the receivables to the subtrust, and designate the investor as the beneficiary. The investor would also receive a Series 2005–A Beneficial Interest Certificate granting a 100% interest in the rights to the receivables in the trust.

Investors in the trust structure usually paid between 5% and 6% of the notional value of the receivables, which was also the tax basis eventually claimed, plus fees charged by the promoters to obtain their subtrust interests. [25] The purchase money went into the main trust's bank account, but

---

[24] Jetstream, through its "Director", Mr. Rogers, filed petitions for them as their tax matters partner.

[25] For the 2005 transactions, the investors appear to have paid approximately 5% of the notional value of the receivables plus other fees. Other evidence in the record suggests that for transactions in subsequent tax years, the purchase price was 6%.

over the course of 2005, 2006, and 2007, these amounts were essentially transferred to Sugarloaf. Even though the purchase money went into the bank account Mr. Rogers established for the main trust, the parties to the transaction viewed the transaction as a purchase and not a contribution of money to a trust account. For example, most investors signed an Agreement for Purchase of Trust Beneficial Interest. The compliance booklets, which investors received and signed, cast the transaction as a purchase of a beneficial interest in the main trust.

The investors, pursuant to the agreements creating the subtrusts, had the power to transfer the certificates of beneficial ownership. The only apparent restriction was that an investor had to give notice to the trustee. Furthermore, an investor could at any time choose to revoke and terminate the subtrust in which that investor had acquired an interest. During the revocation and termination, the investor was entitled to direct the disposition of the subtrust assets.

Mr. Rogers prepared and filed for each main trust and each subtrust a Form 1041, U.S. Income Tax Return for Estates and Trusts. The returns indicated that each subtrust was a grantor trust and attached Grantor Information Statements. These statements indicated that the investors were the grantors and listed amounts for collection income, collection expenses, fiduciary expenses, legal expenses, and section 166 deductions. The main trusts' returns indicated that the investors were the beneficiaries and reported no gains or losses.

Respondent issued notices of deficiency to the subtrust investors. Some of these investors petitioned the Court for redetermination. We consolidated some of those cases for trial at the same time as the partnership and Sugarloaf cases. All but Mr. and Mrs. Rogers and Gary R. Fears[26] have settled with respondent, and we have since severed those other individual tax cases from this group.

B. *Sterling Ridge Trust*

Mr. and Mrs. Rogers invested in the Sterling Ridge 2005–A Subtrust through an S corporation wholly owned by Mrs. Rogers, Sterling Ridge, Inc. Mr. Rogers was president of

---

[26] *See supra* note 6.

Sterling Ridge. Sugarloaf contributed receivables to Sterling Ridge 2005 Trust with a claimed tax basis of $5 million. Sterling Ridge 2005 Trust allocated these receivables to the Sterling Ridge 2005–A Subtrust. Sterling Ridge, Inc., purchased the beneficial interest in Sterling Ridge 2005–A Subtrust for $150,000. Sterling Ridge, Inc., sent the purchase money to the Heritage Bank account of the Sterling Ridge 2005 Trust. Over the course of December 2005 $95,500 was withdrawn from this bank account.

Mr. Rogers filed Forms 1041 for the main trust and the subtrust for the tax years 2005 and 2006. On the subtrust's 2005 Form 1041, he attached a Grantor Information Statement stating that Sterling Ridge, Inc., was the grantor. This statement also listed collection income of $1,518, collection expenses of $304, a fiduciary expense of $1,000, a legal expense of $1,000, and a section 166 expense of $4,850,000. On its 2006 Form 1041, the subtrust reported collecting $39,232 of income and a collection expense of $19,616.

Sterling Ridge, Inc., on its 2005 Form 1120S, U.S. Income Tax Return for an S Corporation, prepared by Mr. Rogers, reported a loss of $3,282,119 almost entirely attributable to the $4,850,000 section 166 deduction.[27] Mr. and Mrs. Rogers reported this loss on their 2005 tax return, which they both signed. Respondent timely issued a notice of deficiency for 2005 disallowing, among other determinations, the section 166 deduction that flowed through from Sterling Ridge. Mr. and Mrs. Rogers timely petitioned this Court for redetermination.

## V. *The Section 166 Deduction: Aggregate and Arbitrary*

At no point did the participants in these transactions conduct any kind of study as to which of the receivables should be written down. The individual receivables were not charged off individually. Mr. Gabel's handwritten notes after a 2005 meeting in Brazil reflect the reality that Multicred lacked the resources to conduct a writeoff study. At one point, statistical

---

[27] Sterling Ridge did not report the collection expense or the fiduciary expense from the 2005 Grantor Information Statement, and it is not clear whether the legal expense and the collection income were included on its return.

sampling was discussed, but such a sampling was never done.

## VI. *The Hub: Searching for Sugarloaf*

### A. *Uncertain Ownership*

Evidence as to the purported owners of Sugarloaf is contradictory. The three principal sources all provide conflicting information. First, contribution agreements suggest that Jetstream owns a 1% interest in Sugarloaf, Arapua owns a 99% interest in Sugarloaf, Globex owns a 99% interest in Sugarloaf, and CBD owns a 17% interest in Sugarloaf. Second, Sugarloaf's Quickbooks balance sheet for 2003 lists Barnard, CITCO NV, Mr. Rogers, and Teviot as having equity interests in Sugarloaf.[28] The 2004 yearend balance sheet shows the same equity owners. The 2005 yearend balance sheet reflects that the following entities and persons owned equity in Sugarloaf: Barnard, CITCO NV, Mr. Rogers, Multicred, Sugarloaf Overseas, and Teviot. Mr. Rogers testified that Barnard, CITCO NV, and Teviot all made equity investments in Sugarloaf. He also stated that the balance sheets, with the 2005 yearend balance sheet time-stamped October 2006, reflected only equity deposits that had been recorded up to that point and that the equity portion of the balance sheets was irrelevant. Third and finally, Schedules K–1, Partner's Share of Income, Deductions, Credits, etc., filed with Sugarloaf's 2004 and 2005 tax returns claimed that Jetstream was a 1% capital and 0.1% profit and loss owner, Warwick a 1% capital and 0.1% profit and loss owner, CBD a 49% capital and 49.9% profit and loss owner, and Globex a 49% capital and 49.9% profit and loss owner.

Additional evidence provides no clarity. With respect to Teviot and Barnard, a May 3, 2005, email from Mr. Mazzucchelli to Mr. Rogers lists investors in Sugarloaf. These investors were Andrew Barnard for $100,000, Teviot Investments, Ltd., for $100,000, and Warwick for $100,000. Sugarloaf's bank accounts show wire transfer deposits in

---

[28] According to Mr. Rogers, Teviot is Teviot Investments, Ltd., a company related to Mr. Mazzuchelli, and Barnard is Mr. Mazzuchelli's father-in-law. Somewhat surprisingly, the voluminous record in these cases affords no meaningful information about CITCO NV.

December 2004 from Teviot and Barnard in the amounts of $200,000 and $99,995, respectively.

A fax from Ms. Dowek to Mr. Rogers suggests that Sugarloaf Overseas was due $950,000 on behalf of a PDA Investor Group for acquisition of notes. Emails among the parties suggest that Teviot and Barnard were involved, along with Multicred and Mr. Rogers, in the purchase of the CBD assets. Mr. Rogers also states that Sugarloaf Overseas received a $1 million payment for the sale of CBD receivables having a $47,500,000 notional face value.

B. *Adjustments to Income*

Respondent used the specific item method to reconstruct Sugarloaf's income for the 2004 and 2005 tax years through a bank deposits analysis. The only deposits remaining in dispute for the 2004 tax year are:

| Date | Source | Amount |
|------|--------|--------|
| 12/1/2004 | Teviot Investments Ltd. | $200,000 |
| 12/20/2004 | Andrew A. Barnard | 99,995 |
| Total | | 299,995 |

Mr. Rogers testified that these amounts represented equity investments. He also testified that Mr. Mazzucchelli approached him in 2010 demanding repayment of money Mr. Barnard sent to Sugarloaf.

Respondent also alleges that the following deposits in 2005 constitute gross income to Sugarloaf:

| Date | Description[1] | Amount |
|------|-------------|--------|
| 7/28/05 | Unknown—deposit from PPI | $72,000 |
| 9/28/05 | Multicred | 49,982 |
| 11/10/05 | Unknown—deposit from PPI | 60,000 |
| 11/29/05 | Kevin Walzter | 100,000 |
| 11/30/05 | Unknown—Sterling Ridge | 87,500 |
| 12/7/05 | M–D Medical Services | 24,000 |
| 12/14/05 | Betacom Inc. | 180,000 |
| 12/19/05 | Sugarloaf Overseas | 249,985 |
| 12/23/05 | Orchard Financial Group, LLC | 60,000 |
| 12/29/05 | Capital Preservation Services | 12,000 |
| 12/30/05 | CO Trust | 30,000 |

| *Date* | *Description*[1] | *Amount* |
|---|---|---|
| Total | | 925,467 |

[1] The Description column is gleaned from the bank statements. Where the bank statements are missing or not helpful, we use "unknown" followed by, for demonstrative purposes, the description or source as listed in Sugarloaf's Quickbooks reconciliation. This is not a finding that these are necessarily the sources of the deposits because we do not believe the Quickbooks data alone is a sufficiently reliable indicator of Sugarloaf's items of income and loss.

With respect to the July 28, 2005, $72,000 deposit, the parties provided a customer receipt evidencing a deposit in that amount, but it does not otherwise identify a source. Also in the record are handwritten notes stating that the July Sugarloaf bank statement is missing and purporting to show that the $72,000 deposit was from "JER". The Sugarloaf Quickbooks bank account reconciliation records the deposit as a deposit from "PPI a/c".

The September 28, 2005, $49,982 deposit is reflected on Sugarloaf's bank statement as a wire transfer from Multicred. The Quickbooks reconciliation also records this amount as a deposit from Multicred.

The bank account statement for Sugarloaf does not list any detail beyond "deposit" for the $60,000 November 10, 2005, deposit. The Quickbooks reconciliation describes this deposit as a deposit from PPI and/or Mr. Rogers.

The bank account statement describes the $100,000 November 29, 2005, deposit as a wire transfer from Kevin Waltzer. The Quickbooks reconciliation describes this deposit as "Customer Deposits/Retainers".

The bank account statement lists no detail beyond "deposit" for the $87,500 November 30, 2005, deposit. The Quickbooks reconciliation describes the deposit as a deposit from Sterling Ridge.

The bank account statement describes the December 7, 2005, $24,000 deposit as a wire transfer from "M–D Medical Services". The Quickbooks reconciliation describes this deposit as "Customer Deposits/Retainers".

The bank account statement describes the December 14, 2005, $180,000 deposit as a wire transfer from "Betacom Incorporated". The wire transfer information sheet lists a reference of "Betacom 2005 Trust". The Quickbooks reconcili-

ation describes this deposit as "Customer Deposits/ Retainers".

The bank account statement describes the December 19, 2005, $249,985 deposit as a wire transfer from Sugarloaf Overseas. The Quickbooks reconciliation does not describe this deposit in any meaningful way but does indicate it is a deposit from Sugarloaf Overseas.

The bank account statement describes the December 23, 2005, $60,000 deposit as a wire transfer from Orchard Financial Group LLC. The wire transfer information sheet lists a reference of "30000 - Lance Barton 2005 Fund 30000 - Brad Black 2005 Fund". The Quickbooks reconciliation describes this deposit as "Deposits from Barton (30,000) and Black (30,000)".

The bank account statement describes the December 29, 2005, $12,000 deposit as a wire transfer from Capital Preservation Services. The wire transfer information sheet lists the same as well as a reference to "CPS 2005 Trust". The Quickbooks reconciliation describes this deposit as "Customer Deposits/ Retainers".

The bank account statement describes the December 30, 2005, $30,000 deposit as a wire transfer from CO Trust. The Quickbooks reconciliation describes this deposit as from CO Trust and contains Mr. Rogers' initials.

## C. *Adjustments to COGS*

In the FPAA respondent also adjusted Sugarloaf's reported cost of goods sold. On its 2004 tax return, Sugarloaf reported a cost of goods sold of $122,950,000. Sugarloaf claimed a cost of goods sold for each holding company it sold to an investor and took the position that the cost of goods sold was equal to the claimed adjusted basis in the contributed receivables.[29]

## D. *Disallowed Deductions*

Sugarloaf claimed on its 2004 and 2005 tax returns the following miscellaneous deductions:

---

[29] The total of the claimed adjusted bases of the receivables in the companies at issue in these cases is $102,950,000. This amount does not include three transactions which are not part of these cases, for which the total claimed adjusted basis is $20 million.

| *Deduction* | *2004* | *2005* |
|---|---|---|
| Legal & professional fees | $218,530 | $345,743 |
| Management fees | 80,000 | 290,000 |
| Consulting fees | 430,000 | 78,312 |
| Amortization | 86 | 400 |
| Meals & entertainment | 280 | --- |
| Accounting | 18,120 | 27,229 |
| Bank charges | 53 | 73 |
| Computer services | --- | 2,000 |
| Office expense | --- | 2,679 |
| Trust expense | --- | 236,000 |
| Total | 747,069 | 982,436 |

Respondent disallowed all deductions. Petitioner provided Quickbooks account records and canceled checks purporting to substantiate the expenses.

## OPINION

Because this Opinion disposes of 10 discrete issues, *see supra* pp. 326–327, we first offer a road map for the reader. We begin with the big picture. In Part I we focus on Sugarloaf, analyzing (1) whether it constitutes a bona fide partnership for Federal income tax purposes, (2) whether the Brazilian retailers made valid contributions to it under section 721, (3) whether the step transaction doctrine should be applied to collapse those claimed contributions and the retailers' subsequent redemptions into sales, such that the receivables had a cost basis under section 1012 rather than a carryover basis under section 723, (4) whether the 2004 partnership transactions had economic substance, and (5) whether the statutory prerequisites for a section 166 deduction were satisfied. We then turn in Part II to (6) whether Mr. and Mrs. Rogers' trust investment entitles them to a section 166 deduction for 2005, applying the analysis of Part I to the trust structure in which the Rogerses invested. With respect to Sugarloaf and the trust structure, we present our analyses and holdings in the alternative.

We then turn to the details. In Part III we consider (7) whether Sugarloaf understated gross income and/or (8) is entitled to various deductions for the 2004 and 2005 tax years. In Part IV, we resolve (9) whether Sugarloaf and the other partnerships are liable for the section 6662(a) pen-

alties, and (10) whether Sugarloaf is liable for the section 6662A penalty.

## I. *Superior Trading Revisited*

Section 723 states the general rule that the basis of property a partner contributes to a partnership is a carryover tax basis, which is the same adjusted basis as it had in the hands of the contributing partner, increased by any gain recognized by the contributing partner under section 721(b).

Petitioners contend that the distressed, unpaid Brazilian receivables contributed to Sugarloaf had the same tax basis in the United States as they had in the hands of the Brazilian retailers and that section 723 preserved the built-in losses inherent in those receivables. Under their theory, section 723 continued to operate upon and governed the subsequent contribution of the receivables to the trading companies. Petitioners allege that under section 722, Sugarloaf had a basis in each trading company equal to the basis it had in the receivables. When Sugarloaf contributed the trading company to the holding company, petitioners contend that Sugarloaf again, under section 722, obtained a tax basis in its interest in the holding company equal to its tax basis in the trading company. Here petitioners contend that tax basis was equal to the tax basis in the underlying receivables. And when Sugarloaf sold the holding company, it sold it for a fraction of its adjusted tax basis, resulting in a cost of goods sold much higher than the purchase price.

The investors, when they bought their interests in the holding companies, each took a cost basis. But they then inflated their bases in their partnership interests through contributions of cash, notes, or other property to the holding companies. Thus, when a trading company claimed the section 166 deduction, the investor could claim a corresponding flowthrough deduction up to the full amount of his or her basis in the holding company partnership.

As this recounting of petitioners' theory illustrates, the whole shelter revolves around the initial contribution of the receivables and the shifting of the built-in loss from the tax-indifferent Brazilian retailer to the tax-sensitive United States taxpayer/investor. Up until October 22, 2004, such shifting was theoretically possible because the inside basis

adjustment of section 743(b) was required only if the partnership filed an election under section 754. Section 704(c)(1)(C) now requires allocation of built-in losses to the partner contributing the built-in loss property, and only to that partner. A section 743(b) basis adjustment is now mandatory upon any transfer of a partnership interest in a partnership with a substantial built-in loss. In short, the partnership version of the transaction as originally structured by Mr. Rogers clearly no longer worked after October 22, 2004, even according to Mr. Rogers' interpretation of the law; thus, Mr. Rogers substituted his trust structure. We add the caveat concerning Mr. Rogers' interpretation of the law because, for all of the reasons we articulated in *Superior Trading*, his structures were conceptually flawed, very clearly never worked, and in any event were never fully implemented in accordance with Mr. Rogers' design.

Respondent attacks the 2004 partnership transactions using a variety of analytical tools. He unscrews the partnership itself, taking the position that Sugarloaf was not a valid partnership because the parties did not intend to enter into a partnership nor did the alleged "contributions" of receivables ever properly occur. He next saws through all the steps undertaken by the parties and collapses them into simple sales and purchases of receivables. Using the heaviest hammer in the toolbox, he then smashes the entire transaction as lacking economic substance. Finally, large-scale demolition completed, he pries apart the section 166 deduction piece by piece, contending that petitioners failed to prove they satisfied the requisite statutory elements.

### A. *Still Not a Valid Partnership*

As an initial matter, we ask whether the retailers and Jetstream formed a partnership. "Whether a valid partnership exists for purposes of Federal tax law is governed by Federal law. *See Commissioner v. Culbertson*, 337 U.S. 733, 737 (1949)." *Superior Trading, LLC v. Commissioner*, 137 T.C. at 81. The Supreme Court directs us to ask "'whether the partners really and truly intended to join together for the purpose of carrying on the business and sharing in the profits and losses or both.'" *Commissioner v. Culbertson*, 337 U.S. at 741 (quoting *Commissioner v. Tower*, 327 U.S. 280, 287 (1946)). The question is one of fact. *Id.* at 742.

Section 301.7701–3(a), Proced. & Admin. Regs., allows "[a]n eligible entity with at least two members * * * [to] elect to be classified as * * * an association * * * or a partnership". If no election is made, the regulations by default treat an eligible two-or-more-member entity as a partnership. Sec. 301.7701–3(b)(i), Proced. & Admin. Regs. These so-called check-the-box regulations do not supersede *Culbertson* insofar as the putative members must still come together to form an entity. *See, e.g.*, *Superior Trading, LLC v. Commissioner*, 728 F.3d at 680 (applying the tests of *Culbertson* and *Tower*). And we do not believe or find that Jetstream, Globex, Arapua, and/or CBD came together to form a partnership.

Nothing in the record convinces us that Jetstream, Globex, and CBD intended to join together for the purposes of carrying on a debt collection business. Everything in the record convinces us that Globex and CBD had every intention of dumping their distressed receivables and that Jetstream intended to sell a tax shelter.

Among many other indicators, the math in the contribution agreements between Sugarloaf and Arapua, CBD, and Globex just does not add up. According to these agreements, the three Brazilian retailers own a collective 215% interest in Sugarloaf. Mr. Rogers would have us believe that with every new contribution agreement, the membership interests of the current members were diluted to make room for the new member. But he provides no contemporaneous acknowledgment or assent from the members of such dilution of their membership interests nor other corroborating evidence.

Their arithmetical flaws aside, the contribution agreements highlight a second indicator that no partnership was formed: They directly conflict with other evidence in the record as to who Sugarloaf's purported partners even were. Arapua, CBD, and Globex executed contribution agreements suggesting that Jetstream was Sugarloaf's only other partner. Sugarloaf's 2004 and 2005 tax returns identify Jetstream, CBD, and Globex as partners but exclude Arapua and include Warwick. And Mr. Rogers testified that there are at least three other equity partners in Sugarloaf whose capital interests do not appear on Sugarloaf's tax returns. There is not a scrap of documentation of these supposed capital interests outside of Quickbooks balance sheets, corroborated only by Mr. Rogers' self-serving testimony.

Parties genuinely embarking on a joint business endeavor with the intent of sharing in its profits and losses would not accept such ambiguity regarding their respective proportions and with whom they would be sharing those profits and losses. These issues in Sugarloaf's formation are alone enough for us to conclude that, as a factual matter—and as was true in *Superior Trading*—the parties never intended to join together in the conduct of a business. But we need not and do not stop there.

### B. *Poorly Disguised Sales*

Like the transactions with the partnerships, the transactions with the Brazilian retailers in these cases suffer the same infirmity as the transactions in *Superior Trading*; namely, Mr. Rogers has once again failed to adequately and convincingly rebut persuasive evidence of redemptions.[30] Both Globex and CBD received cash distributions in redemption of their interests within two years of their alleged contributions of property to Sugarloaf.

Generally contributions of property by partners to a partnership do not trigger gain or loss recognition. Sec. 721(a). But in some situations the direct or indirect transfer of money or other property to a partner that is related to a direct or indirect transfer of money to the partnership can be recharacterized as a sale or exchange of property. Sec. 707(a)(2)(B). The basic test to determine whether the transfers constitute a sale of property is whether, considering all the facts and circumstances, "(i) [t]he transfer of money or other consideration would not have been made but for the transfer of property; and (ii) [i]n cases in which the transfers are not made simultaneously, the subsequent transfer is not dependent on the entrepreneurial risks of partnership operations." Sec. 1.707–3(b)(1), Income Tax Regs. The regulations instruct us to consider a number of facts and circumstances in determining whether the transaction constitutes a sale. *Id.* subpara. (2).

---

[30] There is also a significant question whether the purported transactions ever occurred given the apparent failure to properly identify the receivables being transferred, to notify the makers, and to otherwise comply with Brazilian law.

The regulations governing disguised sales also contain a two-year presumption. *Id.* para. (c). Distributions within two years of a contribution give rise to a presumption that the transaction is a disguised sale. *Id.* Distributions more than two years after the contribution give rise to a presumption that the transaction is not a disguised sale. *Id.* Petitioners here bear the burden of rebutting the former presumption. *See Superior Trading, LLC v. Commissioner*, 738 F.3d at 681.

With respect to Globex, as Mr. Hartigan signed up investors and received the purchase price, he forwarded some of the money to Multicred. Multicred used a portion of this money to redeem Globex. These initial payments took place in 2004 and thus trigger the two-year presumption in favor of a sale. [31] Petitioners did nothing to rebut this presumption, and it is only strengthened by the undated letter in which Globex requests a redemption.

Furthermore, Mr. Rogers sent additional money to the account of Globalstores, which we believe to be related to Globex, in 2006. The evidence surrounding these 2006 payments shows that Mr. Rogers believed that he had already paid Globex. It is possible that these 2006 payments were for the purchase of additional receivables. Either way, petitioners introduced no evidence sufficient to rebut the disguised-sale presumption raised by Mr. Hartigan's payments to Globex via Multicred in 2004. Therefore, Sugarloaf, to the extent it was a partnership, had only a cost basis in the Globex receivables. Because of the opaque manner of the redemption, Sugarloaf lacks clear records of what it paid for

---

[31] Mr. Rogers and Mr. Hartigan spent a significant portion of the trial disputing who paid what, when, and why. Mr. Rogers evidently believes, or at least would have us believe, that Mr. Hartigan embezzled the money paid by the investors and due to Sugarloaf. Mr. Hartigan says that, pursuant to Mr. Rogers' instructions, he sent the money to Multicred. Respondent, to the extent he wanted to get embroiled in this dispute, states these disagreements amount to finger-pointing possibly stemming from Mr. Hartigan's 10% fees. Ultimately, the evidence shows that Mr. Rogers instructed Mr. Hartigan to send portions of the payments Mr. Hartigan collected from investors and owed to Sugarloaf, to Multicred, as constructive distributions from Sugarloaf. To us, the intent to distribute the cash in 2004 is sufficient to invoke the disguised-sale rule. At the very least, it is near-conclusive proof that the transfer of the receivables would not have been made but for the promise of near-contemporaneous cash payments.

the receivables and so has not established that its basis was greater than zero.

With respect to CBD, we also find that the two-year presumption in favor of a disguised sale applies. While the transactions here were slightly more complex, the weight of the evidence reflects an indirect transfer of money to CBD in exchange for a direct transfer of assets. The purported transfer of assets took place as early as the date of the contribution agreement, October 1, 2004. CBD received money for its partnership interest by the end of December 2004. As with the Globex receivables, petitioners have not presented evidence sufficient to overcome the presumption under the disguised-sale regulations that the transaction should be treated as a sale. Therefore, in Sugarloaf's hands, the CBD receivables, like the Globex receivables, had only a cost basis.

C. *Retracing Our Steps*

Once again echoing *Superior Trading*, we also believe that the transactions at issue here should be collapsed to reflect their true economic substance: a sale of receivables from the retailers to Sugarloaf. The true substance of a transaction rather than its nominal form governs its Federal tax treatment. *Superior Trading, LLC v. Commissioner*, 137 T.C. at 88; *see also Commissioner v. Court Holding Co.*, 324 U.S. 331, 334 (1945). One tool that this Court, like others, uses to drill down to the substance of a transaction is the step transaction doctrine. *See Gordon v. Commissioner*, 85 T.C. 309, 324 (1985) ("[F]ormally separate steps in an integrated and interdependent series that is focused on a particular end result will not be afforded independent significance in situations in which an isolated examination of the steps will not lead to a determination reflecting the actual overall result of the series of steps."). In deciding whether to invoke this doctrine, courts generally look to one of three alternative tests: the binding commitment test, the end result test, or the interdependence test. *Superior Trading, LLC v. Commissioner*, 137 T.C. at 88.

The binding commitment test is the most restrictive and asks whether there was a binding commitment at the time of the first step to take the subsequent steps. *Commissioner v. Gordon*, 391 U.S. 83, 96 (1968). This test "is seldom used and is applicable only where a substantial period of time has

passed between the steps that are subject to scrutiny." *Andantech LLC v. Commissioner*, T.C. Memo. 2002–97, slip op. at 70, *aff'd in part, remanded in part*, 331 F.3d 972 (D.C. Cir. 2003); *see also McDonald's Rests. of Ill., Inc. v. Commissioner*, 688 F.2d 520, 525 (7th Cir. 1982) (stating that the test "was formulated to deal with the characterization of a transaction that in fact spanned several tax years"), *rev'g* 76 T.C. 972 (1981). The transactions in question took place within two months at the shortest and, if we look only at Mr. Rogers' 2006 payment to Globex and disregard the contemporaneous payments by Mr. Hartigan, two years at the longest. This is not a situation where the transactions spanned several years, and it is unclear whether the binding commitment test should apply. *See Superior Trading, LLC v. Commissioner*, 137 T.C. at 89 (citing *Associated Wholesale Grocers, Inc. v. United States*, 927 F.2d 1517, 1522 n.6 (10th Cir. 1991), for the same proposition).

The end result test looks to the subjective intent of the parties and asks "whether the formally separate steps are prearranged components of a composite transaction intended from the outset to arrive at a specific end result." *Id.*; *see also McDonald's Rests. of Ill., Inc. v. Commissioner*, 688 F.2d at 524. In these cases, Mr. Rogers intended from the outset to import the foreign losses into the United States to obtain tax benefits. He could not have done so without the alleged partnership contributions and subsequent distributions—otherwise he would lose the tax basis and would be unable to allocate the built-in losses to the investors.

While no one from Globex or CBD testified as to the intent of the Brazilian retailers, our disguised-sale analysis above supports the conclusion that they intended from day one to obtain cash for their assets independent of any entrepreneurial risk of a debt collection business. In fact, the parties underwent transactional contortions to avoid the appearance of a redemption. In the case of CBD, the parties used a series of middlemen and loan documents. In the case of Globex, Mr. Rogers and Mr. Hartigan sent the money to Globex through Multicred. In both cases the end result is the same: The Brazilian retailers received cash, and Sugarloaf acquired receivables with, in its view, built-in tax losses. The end result test allows and encourages us to collapse the contribution of

receivables to Sugarloaf and its subsequent distributions of money and to treat the transactions as sales.

The same holds true when we apply the interdependence test, which asks "whether 'the steps are so interdependent that the legal relations created by one transaction would have been fruitless without a completion of the series.'" *Penrod v. Commissioner*, 88 T.C. 1415, 1430 (1987) (quoting *Redding v. Commissioner*, 630 F.2d 1169, 1177 (7th Cir. 1980), *rev'g on other grounds* 71 T.C. 597 (1979)). The steps in the transactions among Sugarloaf, the retailers, and the intermediaries who funneled cash to the retailers wholly lack valid and independent economic or business purposes, which represents the heart of the inquiry under the interdependence test. *Superior Trading, LLC v. Commissioner*, 137 T.C. at 90. Petitioners cannot explain the redemption of the Brazilian retailers except to claim any payments were participation payments due to Sugarloaf's securitization of the receivables. This feeble explanation—much like Mr. Rogers' claims that when he used the word "redeemed" in contemporaneous documents he was using the term loosely, and that he used the term "purchase" as a term of art—do not persuade us that the cash payments to the retailers served any purpose other than redeeming their purported partnership interests. We find no economic or business purpose for the Brazilian retailers' entry into and exit from Sugarloaf. These transactions' only purpose was to facilitate the always-intended writeoff of the receivables' built-in losses and their allocation to the United States tax shelter investors.

Thus, we collapse the steps undertaken by Mr. Rogers, the retailers, and the intermediaries. The proper characterization of the "stepped" transaction is as a sale of the receivables from the retailers to Sugarloaf. Hence, Sugarloaf's basis in the receivables would be a cost basis. With respect to CBD, the evidence shows that the money sent to CBD through middlemen was $800,000. Thus, Sugarloaf took a basis in the CBD receivables of $800,000. As discussed *infra* pp. 359–360, this finding does not allow the trading company petitioners a section 166 deduction because they failed to prove that they meet the requirements of section 166.

The evidence with respect to Globex is less clear. Globex clearly received money from both Mr. Hartigan, via Multicred, in 2004 and again from Mr. Rogers in 2006, but

petitioners were unable to substantiate these payments in any meaningful manner. Evidence suggests that Mr. Rogers sent Globex $950,000 in 2006, but its not clear whether this payment was solely duplicative of payments by Mr. Hartigan or whether a portion of it was for a new batch of receivables. Either way, it is not enough for us to accurately determine Sugarloaf's cost basis. Consequently, petitioners having failed to carry their burden of establishing basis, Sugarloaf had a zero basis in the Globex receivables.

D. *Sham on You*

A general principle of Federal income taxation is that while a taxpayer has a right to conduct transactions in a manner that minimizes or outright avoids Federal income tax, *Gregory v. Helvering*, 293 U.S. 465, 469 (1935), the taxpayer does not have a right to use forms or structures lacking economic substance to avoid taxation, *Zmuda v. Commissioner*, 79 T.C. 714, 719, *aff'd*, 731 F.2d 1417 (9th Cir. 1984). In such a case, "[s]ubstance prevails over form." *Superior Trading, LLC v. Commissioner*, 728 F.3d at 680. This doctrine is as applicable in the trust context, *Paulson v. Commissioner*, 992 F.2d 789, 790 (8th Cir. 1993), *aff'g* T.C. Memo. 1991–508, as it is in the partnership context, *Superior Trading, LLC v. Commissioner*, 728 F.3d at 680.

The Court of Appeals for the Seventh Circuit, addressing a transaction almost identical to the 2004 partnership transactions in these cases, said: "There is not even a colorable basis for the tax shelter that * * * [Mr. Rogers] created and the * * * [parties] implemented." *Id.* at 682. Affirming this Court's decision for the Commissioner, the Court of Appeals held that the Sugarloaf-type entity in that case was a sham partnership and "entitled to none of the benefits that the Internal Revenue Code bestows on partnerships." *Id.* at 681. The Court of Appeals concluded that "[n]o joint business goal motivated the creation of Warwick", the Sugarloaf-type entity, and that a redemption by Warwick of the Brazilian retailer created the presumption of a sale, which the taxpayers did not rebut. *Id.* at 680–681. The only differences in these cases are that two different Brazilian retailers were used, and the redemption of these retailers occurred in a slightly different manner. But for all practical purposes, the transactions are the same. Consequently, under the Court of

Appeals for the Seventh Circuit's logic and ours, Sugarloaf must also be a sham partnership not entitled to the benefits of the Federal income tax laws.

### E. *Statutory Noncompliance*

The loss deductions ultimately claimed by the partnerships and by Mr. and Mrs. Rogers rested on the claim that the receivables were bad debts. Section 166(a) provides:

> SEC. 166(a). GENERAL RULE.—
>   (1) WHOLLY WORTHLESS DEBTS.—There shall be allowed as a deduction any debt which becomes worthless within the taxable year.
>   (2) PARTIALLY WORTHLESS DEBTS.—When satisfied that a debt is recoverable only in part, the Secretary may allow such debt, in an amount not in excess of the part charged off within the taxable year, as a deduction.

The amount of the deduction is limited to the taxpayer's adjusted basis. Sec. 166(b). The Code does not permit noncorporate taxpayers to take ordinary income deductions under section 166 for wholly or partially worthless nonbusiness debt, requiring that they instead treat such worthlessness as a capital loss. Sec. 166(d)(1). Nonbusiness debt is "debt other than—(A) a debt created or acquired (as the case may be) in connection with a trade or business of the taxpayer; or (B) a debt the loss from the worthlessness of which is incurred in the taxpayer's trade or business." Sec. 166(d)(2). The taxpayer must establish the amount of the debt that is worthless. Sec. 1.166–3(a)(2)(ii), Income Tax Regs.

Respondent distills the above requirements into four elements: (1) a charge-off for a partially worthless debt, (2) proof of a trade or business, (3) proof of worthlessness, and (4) proof of basis in the debt. We agree with this characterization and also agree with respondent that petitioners have not carried their burden of proof with respect to any of these elements.

First, the partnerships and the trusts, as far as we can tell, did not keep reliable, if any, financial books or records, particularly as to the specific receivables purchased and which ones should be charged off. Instead a blanket 97% of all receivables was used for charge-off purposes. Thus, petitioners failed to properly show that they charged off the portion of the debt claimed as a deduction.

Second, petitioners failed to show that they acquired the receivables in connection with a trade or business. The trading companies and the trusts did not operate as trades or businesses. They merely operated as conduits for losses imported into the U.S. tax system. With one exception, there is no evidence that any of the investors entered into these relationships with the expectation of economic profit independent of the tax results. [32] In addition, in the case of the Globex receivables, it is likely that the collection efforts (the only purported business activity with which Sugarloaf and the other partnerships were connected) did not even begin until a considerable time after the receivables were acquired.

Third, petitioners failed to prove worthlessness. Evidence in the record reflects that petitioners and Multicred could not conduct an analysis of the individual debts. And petitioners provided no statistical study or other analysis of which debts or types of debts were worthless. The fact that every trading company and trust claimed a deduction of 97% across the board undercuts any claim that the companies truly analyzed the assets' value. [33]

Fourth, petitioners failed to prove they ever had bases in the receivables equal to the deductions claimed. For the reasons discussed above, petitioners had at most cost bases.

In summary, petitioners have not carried their burden of proving their entitlement to the claimed section 166 deductions. Respondent correctly disallowed these deductions in full.

## II. *Superior Trading With a Twist of Trust*

The substantive analysis above applies equally to the 2004 and 2005 tax year transactions, in particular the trans-

---

[32] The one exception is Christopher Heath Brown, an investor who questioned Mr. Rogers as to when he would see results. Mr. Rogers essentially rebuffed Dr. Brown, saying that he should be happy with the tax losses, and Dr. Brown did not complain again.

[33] Petitioners' only argument on the worthlessness issue, presented in their answering brief, is: "97% built-in loss was chosen as that was the rate of bad debt reserve provided by Arapua against the balance sheet gross historic cost of the receivables. A partial worthlessness percentage against CBD and Globex receivables could have been less [or more] than the 97% used in the case of Arapua." Far from carrying petitioners' burden of proof, this argument amounts to additional evidence that the 97% worthlessness claim was an arbitrary number.

actions involving Sterling Ridge that underlay the Rogerses' claimed section 166 deduction for 2005. The Brazilian retailers' "contributions" to Sugarloaf failed to preserve the retailers' built-in losses in the receivables because no valid partnership was formed, or alternatively because the "contributions" were in fact disguised sales. Accordingly, there was no, or next to no, section 166 deduction for the subtrusts formed in 2005 to claim.

Yet even leaving aside the fundamental flaws in the transfer of assets at the Sugarloaf level, which necessarily limit built-in losses in the assets of the trusts, the step transaction doctrine discussed *supra* pp. 355–358 applies to collapse the steps in the trust transactions into sales of receivables from Sugarloaf to the main trusts.

The steps of the 2005 transactions can be summarized as follows. Mr. Rogers formed a main trust in the name of an investor. He then caused Sugarloaf to "contribute" receivables to the main trust, formed a subtrust under that main trust, and assigned the receivables to the subtrust. The investor "contributed" cash (and/or promissory notes) to the main trust's bank account, which was controlled by Mr. Rogers, and received in exchange a beneficial interest in the receivables in the subtrust. The investor, by the terms of the various documents, was entitled to take direct ownership of those receivables. Sugarloaf, over the course of months, drained the main trust bank account under the guise of maintenance payments or other payments.

Applying the end result test, the overall objective of these transactions was for Mr. Rogers to sell, and for the investors to purchase, tax losses. Achieving this objective entailed transferring the receivables to the investor in a manner that would preserve the receivables' tax bases in the hands of the Brazilian retailers while obtaining cash from the investors. Because of the AJCA, the partnership structure was no longer viable, so Mr. Rogers employed a trust structure instead. The parties clearly intended that the transaction generate tax losses well in excess of the investors' economic outlays. Applying the interdependence test, no independent business or economic purpose existed for the convoluted trust structure. The creation of the main and subtrusts would be fruitless without the eventual flowthrough of the section 166 deductions. Thus, we have no qualms about collapsing the

steps of the trust transactions. Sterling Ridge's investment in the 2005 trust transaction was no more than a purchase of receivables from Sugarloaf. Thus, Sterling Ridge was entitled to only a cost basis.

Our foregoing conclusions regarding the collapse of the trust transactions into sales of receivables and the basis problems at the Sugarloaf level would each alone suffice to disallow the Rogerses' claimed section 166 deduction for 2005. But the 2005 trust structure fails at a more fundamental level, and lest Mr. Rogers' faulty template persist as a trap for the unwary, we proceed to explain why.

The 2005 trust transactions were close cousins of the 2004 partnership transactions. Because built-in losses could no longer be shifted within a partnership, while the Code contained no analogous limitation for trusts, Mr. Rogers hoped that the receivables would have a carryover basis upon contribution to a trust without the relationship between the investor and Sugarloaf turning into a partnership. *See* sec. 1015. After those receivables had been allocated to a subtrust and an investor designated as its beneficiary, the investor would be the subtrust's beneficiary and grantor, by virtue of the investor's cash "contribution" to the main trust. Because the terms of the various trust documents entitled the investor to take direct ownership of the subtrust assets, Mr. Rogers reasoned that the subtrust would be a grantor trust. In a grantor trust, the person treated as the grantor includes in his or her Federal taxable income, as computed on the tax return, the trust's items of income, deduction, and credits against tax. *See* sec. 671. Hence, the investor could partake in the receivables' built-in losses.

Mr. Rogers also hoped that the main and subtrusts would qualify as trusts under the check-the-box regulations. *See* sec. 301.7701–4, Proced. & Admin. Regs. But Federal law determines how an entity organized under State law is taxed. *Moline Props., Inc. v. Commissioner*, 319 U.S. 436, 438–439 (1943). Whether an arrangement is a trust generally depends on whether "the purpose of the arrangement is to vest in trustees responsibility for the protection and conservation of property for beneficiaries who cannot share in the discharge of this responsibility and, therefore, are not associates in a joint enterprise for the conduct of business for profit." Sec. 301.7701–4(a), Proced. & Admin. Regs.; *see also*

*Morrissey v. Commissioner*, 296 U.S. 344, 357, 359–360 (1935) (discussing the difference between an ordinary trust and a business trust). The "business trust" label "will not change the real character of the organization if the organization is more properly classified as a business entity under § 301.7701–2." Sec. 301.7701–4(b), Proced. & Admin. Regs.[34]

As a purely factual matter, the purpose of the trust arrangements was not "to vest in trustees responsibility for the protection and conservation of property for beneficiaries who cannot share in the discharge of this responsibility". *See* sec. 301.7701–4(a), Proced. & Admin. Regs. The purpose of the main trust and the subtrust was merely to transfer tax losses from one party to another party. The parties did not intend to protect and conserve the receivables, as the absence of assignment and collection documentation demonstrates. That the trusts wrote off most of the receivables within weeks or months of their formation reveals for the fiction that it is the proposition that the trustee here protected and conserved the trusts' assets. Therefore, neither the main trusts nor the subtrusts appear to be trusts for Federal income tax purposes. Nor can we properly classify them as "business trusts", given that they did not operate "to provide a medium for the conduct of a business and sharing its gains." *See Morrissey v. Commissioner*, 296 U.S. at 357.

Because these entities were not trusts for the purposes of Federal income tax law, we are left to determine what hap-

---

[34] Mr. Rogers calls his trusts Illinois business trusts. Such entities, under State law, are not partnerships. *Schumann-Heink v. Folsom*, 159 N.E. 250, 252 (Ill. 1927) (discussing a Massachusetts business trust). A business trust can be a trust "'where the owners of a business, or of shares in a business corporation, transfer the property of the business, or all or a large part of the stock, to trustees for themselves.'" *Hanley v. Kusper*, 337 N.E.2d 1, 6 (Ill. 1975) (quoting G. Bogert, The Law of Trusts and Trustees, sec. 270.40, at 347 (2d ed. 1964)).

Sec. 301.7701–4(b), Proced. & Admin. Regs., merely restates the general principle that labels used by taxpayers are not conclusive. *See Frank Lyon Co. v. United States*, 435 U.S. 561, 583–584 (1978); *see also Hutchinson v. Commissioner*, 47 T.C. 680, 686 (1967) ("'Mere forms of instruments, of course, and the use of words 'trust' and 'trustee' cannot be depended upon in determining whether or not a trust is in reality created. The transaction itself must be scrutinized.'" (quoting *Morsman v. Commissioner*, 90 F.2d 18, 23 (8th Cir. 1937), *aff'g* 33 B.T.A. 800 (1935))). We look beyond Mr. Rogers' labels.

pened. Usually, such an entity with two or more members would, by default, be considered a partnership. Sec. 301.7701–2, Proced. & Admin. Regs. But there was no more intent for the investor and Sugarloaf to join together to conduct a debt-collection business than there was for Sugarloaf and the Brazilian retailers to join together in such a business. *See Commissioner v. Culbertson*, 337 U.S. at 742; *supra* pp. 351–353. Therefore, we are left in a situation analogous to that with the Brazilian retailers and Sugarloaf. The investor exchanged cash for receivables, which were intended to generate tax losses. We note that even if we were to find that the trust investor and Sugarloaf entered into a partnership, the AJCA would prevent the shifting of losses away from a contributing partner, and the disguised sales rules of section 707 would also come into play.

Under both the step transaction doctrine and the rules governing trusts, neither the Sterling Ridge Trust nor its subtrust was a trust for Federal income tax purposes. Rather, Sterling Ridge as a stand-alone entity purchased the receivables from Sugarloaf.

Finally, as we concluded with Sugarloaf, we find that the Sterling Ridge Trust and subtrust lacked economic substance and were shams. Sterling Ridge Trust and subtrust were not trusts for the purposes of Federal income tax law. The parties did not intend for the trustee to preserve and conserve the assets for the beneficiaries. Consequently, Mr. and Mrs. Rogers were entitled to none of the Federal income tax benefits of the trust structure. *See Superior Trading, LLC v. Commissioner*, 728 F.3d at 681 ("'An entity without economic substance, whether a sham partnership or a sham trust, is a sham either way and hence is not recognized for federal tax law purposes.'" (quoting *Sparkman v. Commissioner*, 509 F.3d 1149, 1156 n.6 (9th Cir. 2007), *aff'g* T.C. Memo. 2005–136)).

For the foregoing reasons, we conclude that respondent properly disallowed the Rogerses' claimed section 166 deduction for 2005.

III. *The Devil's in the Details*

Respondent determined that Sugarloaf greatly overstated its cost of goods sold on its partnership return by taking the

position that its cost of goods sold was equal to its claimed carryover basis in the "contributed" receivables. We agree. For the reasons stated above, Sugarloaf failed to prove that it had a basis in the Globex receivables and failed to prove it had a basis greater than $800,000 in the CBD receivables. At most, therefore, Sugarloaf proved a basis of $800,000 in the partnership interests it sold. Sugarloaf is entitled to a cost of goods sold of only $800,000. [35]

With respect to the deductions respondent disallowed, Sugarloaf is not entitled to them. Deductions are "a matter of legislative grace", and taxpayers bear the burden of proving that they are entitled to any deduction. Rule 142(a); *INDOPCO, Inc. v. Commissioner*, 503 U.S. 79, 84 (1992). Taxpayers must identify each deduction, show they meet all requirements, and substantiate all items underlying claimed deductions. Sec. 6001; *Roberts v. Commissioner*, 62 T.C. 834, 836–837 (1974). Section 162(a) allows a deduction for all ordinary and necessary business expenses paid or incurred in connection with a trade or business. But "expenditures made in an attempt to obtain abusive tax shelter benefits are not ordinary and necessary business expenses or otherwise deductible under section 162(a)." *Gerdau Macsteel, Inc. v. Commissioner*, 139 T.C. 67, 182 (2012). The transactions in question were tax shelters, and Sugarloaf's claimed expenditures were made in an attempt to obtain abusive tax shelter benefits. [36]

---

[35] We note that while "economic substance is a prerequisite to the application of any Code provision allowing deductions," *Lerman v. Commissioner*, 939 F.2d 44, 52 (3d Cir. 1991), *aff'g* T.C. Memo. 1988–570, cost of goods sold is not a deduction, *see Azimzadeh v. Commissioner*, T.C. Memo. 2013–169, at *12-*13 (citing *Metra Chem. Corp. v. Commissioner*, 88 T.C. 654, 661 (1987)).

[36] Furthermore, Jetstream, through Mr. Rogers, failed to substantiate items underlying Sugarloaf's deductions. The record includes only a Quickbooks transaction record for most expenses and canceled checks drawn on Sugarloaf's bank account to Mr. Gabel and to Seyfarth Shaw. Sugarloaf's records are generally unreliable, and we do not accept the Quickbooks records as sufficient substantiation. While Mr. Gabel testified that he provided services to Sugarloaf during the years at issue, we have no invoices or other proof, including testimony, of the extent of his services. Mr. Rogers failed to provide evidence as to the nature and extent of the services provided by Seyfarth Shaw. Because of the confusing flows of money among the investors, Seyfarth Shaw, Sugarloaf, and various other

Continued

Respondent also determined that Sugarloaf understated its gross income based upon a bank deposits analysis. Petitioner Jetstream disputes certain deposits for both 2004 and 2005 and accordingly bears the burden of proving that respondent's inclusion of these deposits in Sugarloaf's income is incorrect. *See DiLeo v. Commissioner*, 96 T.C. 858, 869 (1991), *aff'd*, 959 F.2d 16 (2d Cir. 1992).

With respect to the two disputed deposits in 2004, Mr. Rogers claims that both were equity contributions to Sugarloaf. Unfortunately, Mr. Rogers provides no evidence other than his self-serving testimony and a balance sheet. Mr. Rogers disavows the accuracy of the balance sheet with respect to some entries, but expects us to accept it as accurate with respect to others.[37] We decline to do so. In addition, his testimony conflicts with the tax returns filed by Sugarloaf. He did not provide contribution agreements or other indicia of an equity investment by the depositing individuals. Thus, we cannot conclude that these payments were equity contributions. Mr. Rogers did not provide any other explanation for these deposits, and he did not carry Jetstream's burden of proof that these deposits were other than income to Sugarloaf.

With respect to the disputed 2005 deposits, Mr. Rogers claims these deposits are either capital contributions (equity deposits) or amounts transferred to Sugarloaf that should have been deposited directly into trust accounts (trust deposits). As with the 2004 deposits, we reject Mr. Rogers' position. He introduced no evidence, other than self-serving testimony and Quickbooks records, that the equity deposits were in fact equity contributions. As to the July 28, November 10, and November 30, 2005, deposits, Sugarloaf's Quickbooks entries indicate these deposits were from PPI funds or, in the case of the November 30 deposit, Sterling Ridge. But, there is no corroborating evidence that these

---

entities, and in light of the lack of a factual basis on which to make estimates, we decline to estimate the extent of services, and hence we bear heavily on Sugarloaf's inexactitude. *See Williams v. United States*, 245 F.2d 559, 560 (5th Cir. 1957); *Cohan v. Commissioner*, 39 F.2d 540, 543–544 (2d Cir. 1930); *Vanicek v. Commissioner*, 85 T.C. 731, 742–743 (1985).

[37] On brief, Mr. Rogers contends that the amounts shown as equity interests for Multicred and Sugarloaf Overseas are loans, not equity investments.

deposits actually came from PPI, and frankly, we do not find Mr. Rogers' testimony or the Quickbooks entries credible. With respect to the alleged Sterling Ridge deposit, we have no way of knowing whether the deposit came from Sterling Ridge, Inc., or the Sterling Ridge Trust, if it even came from either of these sources.

With respect to the alleged Multicred equity deposit, we have rejected petitioner's contention that Multicred was a partner in Sugarloaf and likewise reject its contention that this deposit was an equity contribution. The Quickbooks entries alone are insufficient to prove these deposits were equity investments. *Cf. Olive v. Commissioner*, 139 T.C. 19, 32–33 (2012) (holding that general ledgers by themselves are insufficient to substantiate items underlying a taxpayer's claimed deductions); *Ohana v. Commissioner*, T.C. Memo. 2014–83, at *21 (finding Quickbooks records of expenses a summary of the taxpayer's assertions, which, when uncorroborated, are not enough to substantiate items underlying the taxpayer's claimed deductions).

While the names of the transferors are consistent with those of trust investors, Mr. Rogers has nonetheless failed to convince us that the trust deposits are anything but income to Sugarloaf. First, we have no evidence that these amounts were ever transferred to the trust bank accounts. Second, and conclusively here, we found that in these 2005 transactions, the investors each purchased a tranche of receivables from Sugarloaf, making the money paid into the trust accounts income to Sugarloaf under section 1001. So, regardless of whether the 2005 investors' payments went into the trust accounts or directly to Sugarloaf, those amounts were still income to Sugarloaf. [38]

---

[38] We note that respondent has determined only that the six trust deposits actually deposited into Sugarloaf's bank account constitute income. Under our findings, all payments by the trust investors would constitute income to Sugarloaf, less fees retained by the promoters. We will not question respondent's magnanimity.

IV. *In the Penalty Box* [39]

A. *Section 6662*

Respondent determined penalties against all of the partnerships in these consolidated cases—that is, for Sugarloaf and for each of the trading companies. He determined that the partnerships were liable for the gross valuation misstatement penalty under section 6662(h) on portions of their underpayments attributable to misstatements of their respective bases in the receivables. Respondent also determined that Sugarloaf is liable for the accuracy-related penalty for negligence or, in the alternative, substantial understatements of income tax on portions of its underpayments attributable to its additional income and the disallowed deductions. He bears the burden of production with respect to these accuracy-related penalties, but petitioners bear the burden of proof if respondent meets his burden of production. *See Higbee v. Commissioner*, 116 T.C. 438, 446–447 (2001).

Section 6662(a) and (b)(3) provides for a 20% penalty to be imposed on the portion of an underpayment of tax required to be shown on a return that is attributable to a substantial valuation misstatement. As relevant here, for returns filed after August 17, 2006, a substantial valuation misstatement occurs when "the value of any property (or the adjusted basis of any property) claimed on any return of tax imposed by chapter 1 is 150 percent or more of the amount determined to be the correct amount of such valuation or adjusted basis (as the case may be)". Sec. 6662(e)(1)(A). For returns filed on or before August 16, 2006, the percentage was 200% instead of 150%. Pension Protection Act of 2006, Pub. L. No. 109–280, sec. 1219(a)(1)(A), (e), 120 Stat. at 1083, 1085. Section 6662(h) increases this penalty to 40% if the value or adjusted basis claimed on the return is 200% or more of the actual value or adjusted basis. For returns filed on or before August 16, 2006, the 40% penalty applies if the value or adjusted basis is 400% or more of the actual basis or value. *Id.* sec. 1219(a)(2)(A). A regulation clarifies that, when the actual value or basis is zero, that value is considered 400% or more

_____

[39] We do not here redetermine the penalties determined against Mr. and Mrs. Rogers and Mr. Fears with respect to their Forms 1040, U.S. Individual Income Tax Return. *See supra* note 6.

of the correct amount. Sec. 1.6662–5(g), Income Tax Regs. Petitioners do not challenge application of this regulation. *See United States v. Woods*, 571 U.S. ___, ___, 134 S. Ct. 557, 566 n.4 (2013) (noting the inherent mathematical problem of dividing a number by zero).

In these cases, respondent has met his burden of production. The Globex receivables had a zero basis, and the partnerships with those receivables grossly overstated their bases in those receivables. For the CBD receivables, which had a total combined basis of $800,000, the partnerships (including two not at issue here) reported a total adjusted basis of $48,600,000. Assuming that each partnership received a tranche of receivables with a basis equal to its pro rata share of the $800,000 aggregate basis, each partnership overstated its basis by far more than 400%. Furthermore, Sugarloaf's aggregate claimed adjusted basis in the partnership interests it sold was far more than 400% of the actual adjusted basis, which we found to be, in total, $800,000.

An accuracy-related penalty will not be imposed "with respect to any portion of an underpayment if it is shown that there was a reasonable cause for such portion and that the taxpayer acted in good faith". Sec. 6664(c)(1). When determining whether a partnership had reasonable cause and acted in good faith, we look to the general partner. *Superior Trading, LLC v. Commissioner*, 137 T.C. at 91. During the years at issue Jetstream was the managing member of Sugarloaf and each of the trading companies. We do not believe Mr. Rogers when he claims that Mr. Mazzucchelli was the manager of Sugarloaf. We think that claim, along with the engagement letter between Sugarloaf and Seyfarth Shaw, a poorly veiled attempt to get around the conflict of interest inherent in having Mr. Rogers' law firm represent a limited liability company controlled, through its tax matters partner, Jetstream, by Mr. Rogers. Mr. Rogers, through Jetstream, was the only individual with the authority to act on behalf of Sugarloaf and the trading companies, and it is his conduct that is relevant for determining whether we should sustain the determined accuracy-related penalties.

As was the case in *Superior Trading*, Mr. "Rogers' knowledge and experience should have put him on notice that the tax benefits sought by the form of the transactions would not be forthcoming and that these transactions would be re-

characterized and stepped together to reveal their true substance." *Id.* at 92. We reject his contention that he reasonably relied on the advice of tax professionals. *See Neonatology Assocs., P.A. v. Commissioner*, 115 T.C. 43, 99 (2000) (establishing a three-factor test for determining whether reliance on tax professionals may be reasonable cause), *aff'd*, 299 F.3d 221 (3d Cir. 2002). Mr. Rogers' assertions on brief that he relied upon outside professionals lack even a smidgen of evidentiary foundation other than his own testimony.

Petitioners have not borne their burden of proof under section 6664(c) with respect to any of the partnerships, and we therefore hold that the section 6662(a) and (h) penalty applies. To be clear, this penalty applies against the trading companies, for overstating their bases in the receivables, as well as to Sugarloaf. In Sugarloaf's case, it not only overstated its basis in the receivables but also overstated its basis in the trading companies that it subsequently sold, resulting in a grossly overstated cost of goods sold.

Further, we find that an accuracy-related penalty of 20% applies to the portions of the undepayments attributable to Sugarloaf's omissions from gross income and disallowed deductions. A section 6662(a) penalty applies to portions of an underpayment of tax due to negligence or disregard of rules and regulations or to a substantial understatement of income tax if the amount of the understatement exceeds the greater of $5,000, $10,000 in the case of a corporation, or 10% of the tax required to be shown on the return. Sec. 6662(b)(1) and (2).

We conclude that respondent has met his burden of production with respect to the penalty for negligence or disregard of rules and regulations. Petitioners failed to substantiate the items underlying their deductions and provide a reasoned and convincing explanation for the deposits. Their recordkeeping appears to have been scanty to nonexistent, and noncontemporaneous beyond a Quickbooks log, which we did not find credible and will not rely on. The cashflows to and from Sugarloaf are confusing, and Mr. Rogers' failure to keep records of the alleged contributions to capital and to explain contemporaneous document equity ownership totaling up to 215% is negligent at best. Furthermore, for the same reasons discussed above, Mr. Rogers has fallen well

short of his burden of proving reasonable cause and good faith.

B. *Section 6662A*

Respondent also seeks to impose a section 6662A penalty on Sugarloaf for its 2004 and 2005 tax years. Section 6662A imposes a 20% penalty on understatements due to reportable transactions or listed transactions. Sec. 6662A(a), (b)(2). This penalty increases to 30% if the taxpayer does not adequately disclose the transaction. Sec. 6662A(c).

For the same reasons discussed below with respect to the 2005 tax year, we find that respondent has satisfied his burden of production as to this penalty for 2004. However, the section 6662A penalty does not apply with respect to the portion of an understatement on which a gross valuation misstatement penalty is imposed. Sec. 6662A(e)(2)(B). We have imposed the gross valuation misstatement penalty on the portions of the 2004 understatement of Sugarloaf that would be subject to the section 6662A penalty, so that penalty does not apply to any amount for Sugarloaf's 2004 tax year.

As for Sugarloaf's 2005 tax year, respondent wants us to apply the section 6662A penalty to "any understatement attributable to adjustments to Sugarloaf's tax characterization of the DAT [distressed asset trust] transaction in 2005". Respondent contends that the DAT transaction is a listed transaction, and Sugarloaf did not disclose it.

Section 6662A(d) refers us to section 6707A(c)(2) for the definition of a listed transaction. The Code defines a listed transaction as a tax avoidance transaction identified by the Internal Revenue Service (IRS) and points us to the regulations under section 6011. Sec. 6707A(c)(2). The regulations define a listed transaction as the same as or substantially similar to any transaction identified by the IRS as such in a "notice, regulation, or other form of published guidance". Sec. 1.6011–4(b)(2), Income Tax Regs. A substantially similar transaction is "either factually similar or based on the same or similar tax strategy." Sec. 1.6011–4(c)(4), Income Tax Regs.

In these cases, no one disputes that the trust transactions are substantially similar to the transaction identified in

Notice 2008–34, 2008–1 C.B. 645. [40] Generally, the IRS requires a taxpayer to disclose listed transactions on a statement attached to the taxpayer's return. Sec. 1.6011–4(e)(1), Income Tax Regs. In these cases, the IRS issued the notice on March 24, 2008, well after Sugarloaf filed its 2005 tax return on October 14, 2006. The regulations in effect for the tax years at issue covered just such a situation, requiring the taxpayer to file a disclosure statement "as an attachment to the taxpayer's tax return next filed after the date the transaction is listed". Sec. 1.6011–4(e)(2)(i), Income Tax Regs. Neither Sugarloaf nor its tax matters partner filed such a disclosure statement. Section 6664(d)(1) provides a reasonable cause and good faith defense to the section 6662A penalty, but only if the transaction is disclosed. Thus, the 30% penalty applies to the portion of Sugarloaf's 2005 understatement that stems from the trust transactions to the extent the understatement is not already subject to the 40% section 6662(h) gross valuation misstatement penalty. *See* sec. 6662A(e)(2)(B).

## V. *Conclusion*

Contrary to Mr. Rogers' contentions throughout these cases, the 2004 partnership structures did not materially

---

[40] Mr. Rogers, on Sugarloaf's behalf, contends that Notice 2008–34, 2008–1 C.B. 645, is invalid as a violation of Executive Order 12866, 3 C.F.R. 638 (1994). He believes that Notice 2008–34, *supra*, is a significant regulatory action, and that under Executive Order 12866 the Office of Management and Budget (OMB) must review proposed significant regulatory action. Because OMB did not do so, Mr. Rogers argues the notice is invalid. In so arguing, he ignores section 10 of the executive order, which states:

Nothing in this Executive order shall affect any otherwise available judicial review of agency action. This Executive order is intended only to improve the internal management of the Federal Government and does not create any right or benefit, substantive or procedural, enforceable at law or equity by a party against the United States, its agencies or instrumentalities, its officers or employees, or any other person. [Exec. Order No. 12866, 3 C.F.R. at 649.]

Mr. Rogers cannot challenge Notice 2008–34, *supra*, as not in compliance with the executive order. *See Blak Invs. v. Commissioner*, 133 T.C. 431, 447 (2009) (rejecting for the same reason a taxpayer's challenge to temporary regulations under Executive Order 12866), *supplemented by* T.C. Memo. 2012–273.

differ from the 2003 structures at issue in *Superior Trading, LLC*. Like Arapua in *Superior Trading, LLC*, the Brazilian retailers in these cases were also redeemed out of the parent partnership (in that case, Warwick), resulting in a deemed sale of the receivables to Sugarloaf. And Mr. Rogers provided no convincing evidence that the structure in these cases had any objective independent of the shifting of losses from a tax-indifferent party to a tax-motivated party.

The 2005 trust transactions differed little from the 2004 transactions. They suffer from the same fatal flaws as the 2004 transactions—namely, the planned and near-contemporaneous redemption of the Brazilian retailers. Further, the form of the transaction, when appropriately stepped together, consists of a sale of receivables to the investors. We treat it as such. In addition, the 2005 trust transaction was devoid of economic substance, and we will therefore issue an order stating that Mr. and Mrs. Rogers are not entitled to the section 166 deduction they claimed on their 2005 tax return.

This Opinion makes abundantly clear that neither the 2004 partnership transaction nor the 2005 trust transaction works, and we have discussed myriad reasons why not. These reasons constitute "alternative holdings, each by itself sufficient to sustain respondent's adjustments". *Superior Trading, LLC v. Commissioner*, T.C. Memo. 2012–110, slip op. at 7.

Moreover, Jetstream, through Mr. Rogers, failed to successfully carry its burden of proof with respect to any of Sugarloaf's claimed deductions on its 2004 and 2005 tax returns. Mr. Rogers similarly failed to provide convincing explanations for the challenged gross receipts in Sugarloaf's 2004 and 2005 tax years.

Sugarloaf is liable for the 40% gross valuation misstatement penalty for the 2004 tax year for overstating the bases of its interests in the holding companies sold to investors. The remaining partnerships in these cases are likewise liable for the 40% gross valuation misstatement penalty for overstating their bases in the receivables. Sugarloaf is further liable for a 20% accuracy-related penalty under section 6662(a) and (b)(1) for the portions of the underpayments due to the disallowed deductions for the 2004 and 2005 tax years and the amounts of income omitted from its 2004 and 2005 tax returns. Sugarloaf is also liable for a 30%

penalty under section 6662A for the reportable transaction understatement attributable to the 2005 trust structure.

The Court has considered all of the parties' contentions, arguments, requests, and statements. To the extent not discussed herein, the Court concludes that they are moot, irrelevant, or without merit. [41]

> *Appropriate orders will be issued at docket Nos. 27636–09 and 30586–09, decision will be entered under Rule 155 in docket No. 671–10, and decisions will be entered for respondent in all other cases.*

-------------------

APPENDIX

Kenna Trading, LLC, Jetstream Business Limited, Tax Matters Partner, docket No. 7551–08; Connemara Trading Group, LLC, Jetstream Business Limited, Tax Matters Partner, docket No. 7552–08; Zugersee Trading, LLC, Jetstream Business Limited, Tax Matters Partner, docket No. 7553–08; Bielersee Trading, LLC, Jetstream Business Limited, Tax Matters Partner, docket No. 7554–08; Ridgeway Fund, LLC, Jetstream Business Limited, Tax Matters Partner, docket No. 7555–08; Grey Stone Trading, LLC, Jetstream Business Limited, Tax Matters Partner, docket No. 7556–08; Turnberry Trading, LLC, Jetstream Business Limited, Tax Matters Partner, docket No. 7618–08; Northgate Trading, LLC, Jetstream Business Limited, Tax Matters Partner, docket No. 7625–08; Thornhill Trading, LLC, Jetstream Business Limited, Tax Matters Partner, docket No. 9021–08; Saddlebrook Trading, LLC, Jetstream Business Limited, Tax Matters Partner, docket No. 9035–08; Suten Fund, LLC, Jetstream Business Limited, Tax Matters Partner, docket No. 9036–08; Remington Trading, LLC, Jetstream Business Limited, Tax Matters Partner, docket No.

-------------------

[41] For instance, we find Mr. Rogers' contention that respondent's failure to audit the subtrusts' returns is fatal to be without merit. Likewise, respondent's statement in his answer in docket No. 671–10 that he prepared the answer without benefit of the administrative file does not render the determined deficiency arbitrary and capricious. Finally, we reject Mr. Rogers' claim to a deduction for Sugarloaf for income reported by Warwick on its 2003 tax return but purportedly never received.

9037–08; R B Taylor Trading, LLC, Jetstream Business Limited, Tax Matters Partner, docket No. 9038–08; Riversedge Fund, LLC, Jetstream Business Limited, Tax Matters Partner, docket No. 9039–08; Murtensee Trading, LLC, Arrowhead Fund, LLC, Tax Matters Partner, docket No. 9040–08; Monte Rosa Fund, LLC, Jetstream Business Limited, Tax Matters Partner, docket No. 9041–08; Ofenpass Fund, LLC, Jetstream Business Limited, Tax Matters Partner, docket No. 9042–08; Knight Trading, LLC, Jetstream Business Limited, Tax Matters Partner, docket No. 9121–08; Essex Fund, LLC, Jetstream Business Limited, Tax Matters Partner, docket No. 9122–08; Lyman Trading, LLC, Jetstream Business Limited, Tax Matters Partner, docket No. 9123–08; Dent-Blanche Fund, LLC, Jetstream Business Limited, Tax Matters Partner, docket No. 9124–08; Harlan Fund, LLC, Jetstream Business Limited, Tax Matters Partner, docket No. 9125–08; Grand-Combin Fund, LLC, Jetstream Business Limited, Tax Matters Partner, docket No. 9126–08; Larkspur Trading, LLC, Jetstream Business Limited, Tax Matters Partner, docket No. 9127–08; Lakeview Trading, LLC, Jetstream Business Limited, Tax Matters Partner, docket No. 9128–08; Davis Fund, LLC, Jetstream Business Limited, Tax Matters Partner, docket No. 14094–08; Cumnor Trading, LLC, Jetstream Business Limited, Tax Matters Partner, docket No. 16796–08; Bodensee Fund, LLC, Jetstream Business Limited, Tax Matters Partner, docket No. 19924–08; Ironwood Trading, LLC, Windmere Fund, LLC, Tax Matters Partner, docket No. 19925–08; Zurichsee Trading, LLC, Jetstream Business Limited, Tax Matters Partner, docket No. 13980–09; Zugersee Trading, LLC, Jetstream Business Limited, Tax Matters Partner, docket No. 13981–09; Warner Fund, LLC, Jetstream Business Limited, Tax Matters Partner, docket No. 13982–09; Riversedge Fund, LLC, Jetstream Business Limited, Tax Matters Partner, docket No. 13983–09; Gary R. Fears, docket No. 27636–09; John E. Rogers & Frances L. Rogers, docket No. 30586–09; Sugarloaf Fund, LLC, Jetstream Business Limited, Tax Matters Partner, docket No. 671–10.